Mr. Justice STRONG
delivered the opinion of the court.
It has not been contended here that the complainants are not entitled to the injunction decreed by the Circuit Court, if the act of the Missouri legislature, approved March 31st, 1868, was a legitimate exercise of the legislative power. But it is insisted that the fifth section of that act is in conflict with the constitution of the State, and, therefore, that the arrangement made under it with the Pacific Railroad Company cannot be held to operate as a discharge of the company from the debt due by it to the State, or as a release of the railroad from the lien of the State’s mortgage. The question presented, then, is this: Was the fifth section of the act mentioned prohibited by the constitution of the State ? By the first section the governor was directed to sell the Pacific Railroad and its appurtenances, in .accordance with the provisions of section five of the act, and of an act approved February 22d, 1851, entitled “An act to expedite the construction of the Pacific Railroad and the Hannibal and St. Joseph Railroad.” By the second section the price for which the railroad was directed to be sold was required to be not less than $8,850,000 payable to the State treasurer, in bonds of the State or in money, within ninety days from the day of sale. If that sum was not obtained the governor was required to buy in the railroad for the State. By the third section it was made a condition of the sale that the purchaser or purchasers should bind himself or themselves to change the gauge of the road within ten years from the date of sale, so as to conform to the gauge of the Union Pacific Railroad. The fourth section enacted that- upon the payment of all the purchase-money, and upon *366 the delivery of an obligation, in conformity to the require* ment of the third section, the governor should execute a deed to the purchaser or purchasers conveying all such right, title, and interest in and to the said Pacific Railroad, its franchises, appurtenances, and the property belonging thereto as were subject to the lien of the State. Then followed the fifth section, which is the one mainly in contest. It enacted that if the Pacific Railroad Company should, at any time within ninety days after the 1st day of April, 1868, pay into the treasury of the State the sum of $350,000, in the bonds-of the State or in money, then, and in that event, the governor should not advertise the road for sale; and if the company should, within ninety days thereafter, pay into the State treasury an additional sum equal to $5,000,000 in all (either in cash or in Missouri State bonds), the governor should, upon the production of the receipts of the State treasurer for the said amounts, execute and deliver to the said Pacific Railroad Company a deed of release for all claims, title, and interest which the State of Missouri had in and to the railroad, its property and appurtenances, and that the Pacific Railroad Company should, from and after the delivery of the deed, be fully discharged from all claims or debts due the State, and all liability growing out of the issue of the bonds of the State to aid in the construction of their railroad.
Within ninety days after the passage of this act the company paid into the State treasury $350,000, and within ninety days after such payment $4,650,000 more, in all $5,000,000, the sum specified in the fifth section, and received from the governor a deed conveying all the right, title, and interest of the State, and discharging it from all liens and claims of the State, and from all liability growing out of the issue of State bonds to aid in the construction of its road.
That this was a compromise of the claims of the State against the company; 'practically, a sale to the company of the State’s interest growing out of its advanse of State *367 bonds under the statutes of 1851, and the following years, is very plain, and such was its obvious intention. The principal of the debt was not then payable. The bonds issued by the State had not then fallen due. All of them were either twenty or thirty-year bonds, and the company was under no obligation to pay the principal until the bonds became payable. The extent of her obligation was measured by the provisions of the act of 1851. That act required the company to make provision for the payment of the principal and interest of the bonds in such manner as to exonerate the State from any advances of money for that purpose, and, had the interest been paid up to 1868, the State could then have exacted no more. The interest, it is true, was in arrears from July 1st, 1859. To that extent the State had an immediate claim upon the company, but as the whole debt, according to the agreed statement of facts, ■was $7,000,000, the aggregate of unpaid interest in 1868 was less than $4,000,000. The arrangement then made, by which $5,000,000 was received in full satisfaction, and the deed given, included, therefore, not only interest due, but principal which had not fallen due, and, hence, it may properly be regarded as a commutation or a sale of the rights of the State to the company.
We come then to the question whether anything in the constitption of the State prohibits such a transaction. A new constitution was adopted in 1865, the fifteenth section of the fourth article of which is as follows: “ The General Assembly shall have no power, for any purpose, to release the lien held by the State upon any railroad.” This provision, it is insisted by the appellants, denied to the legislature the power to make such a disposition of the interests of the State as was made in 1868 in virtue of the fifth section of the act of March 31st of that year.
The language of the prohibition is remarkable. It is not that the General Assembly shall not release the debt due to the State by any railroad company. Legislative control over the debt is left untouched. The provision has reference only to a security for the debt. Had it been intended *368 to put the debt beyond the disposition of the legislature, it would be difficult to find a reason for confining the prohibition to a release merely of the lien. But it is easy to see why it should be ordained that while the debt remained, the security for it should not be given up. And that such was the intention appears quite plainly in view of the state of thiugs which existed when the constitution was framed and adopted. Prior to its adoption it may be said to have become almost a legislative habit to release the liens held by the State upon railroads without discharging the debts. In numerous eases statutes had been enacted by which railroad companies were authorized to borrow money, and to mortgage their roads as security for the loans, the State releasing its lien, to give the mortgagees a priority. The purposes for which these releases were made were various, and they were generally avowed in the statutes. Thus, in 1864 the legislature released the State’s lien upon a part of the Pacific road, avowedly for the purpose of enabling the company to complete its main road to Kansas City. At the same time the lien of the State on the North Missouri Railroad was released for several avowed purposes, — to enable the company to complete their main road to the Iowa State line; to enable the company to construct its west branch; and to enable it to build a bridge across the Missouri River. And again, in 1865, February 16th, the legislature released the first lien of the State upon the road of the same company for the same purposes, retaining, however, a second lien. All this took place very shortly before the constitution was adopted. That such releases were contemplated when the convention framed the constitutional inhibition, and when the people ratified it, can hardly be doubted. The constitution was plainly intended to prohibit them, and, therefore, language was employed denying the power to release the lien, and saying nothing of the debt. Certainly there is no expressed restriction of legislative power over the debt itself. If any exists it must be supplied by implication. Keeping in mind, then, that the constitutional prohibition is directed only against a release of liens, what *369 should be regarded as its meaning? We agree it is not to be frittered away by doubtful construction, but like every clause in every constitution it must have a reasonable interpretation, and be held to express the intention of its framers. It must be held to have been intended for the public protection, for the preservation of the public property, and to make available claims the State held against railroads. But if it is to be construed reasonably, and in accordance with what must have been the intentions of those who adopted it, it cannot be construed literally. It cannot mean that the lien of the State upon a railroad shall not he released upon full payment of the debt, to secure which the lien was created. If it does, it is equivalent to a prohibition against the State’s receiving payment. Surely it will not be contended to deprive the legislature of power to make use of the lien to enforce satisfaction of the debt, though thereby the lien be discharged. That would be to destroy the value of the lien. Nor can it mean that the lien may not be employed to obtain from the property bound by it all that the property is worth and all that the indebted company can pay, though that be less than the entire amount of the debt. It is not a restriction upon the power of the legislature to make the most which in its judgment is possible from the security. In terms the legislature is left unrestricted as to the mode of receiving payment, or settling with its debtois. Composition, accord and satisfaction, and full payment in cash are left within the legislative discretion, at least so far as the liquidation of the debt is concerned. So there is nothing in the clause of the constitution quoted which can be regarded sis a restriction upon the power of the legislature to sell any claims held by the State against a railroad company. It is not an ordinance that the legislature shall not deal with debts due to the State from railroad companies as it may deal with debts due from other debtors. It is that the lien shall not be released for any 'purpose whatever, that is, for the accomplishment of any object, the legislature might have in view, and unless we can hold this means it shall not be released even by full payment of the debt, it *370 cau mean no more than this, that, while the debt remains, the legislature may not let go the security for it. Such a construction accounts for the peculiarity of the language employed. There is a very palpable distinction between the lien which the State holds upon a railroad aud the debt, obligation, or duty which the lien was created to secure. The two could not have been confounded by the framers of the constitution. If it was intended that, under all circumstances, every dollar due from a railroad company should be exacted, and that no settlement should be made, or sale authorized, without payment of the uttermost farthing, it is incredible that, the constitution would not have so declared. That such was not the intention is plainly shown by the railroad ordinance adopted with the constitution, and a part of the organic law of the State. By that ordinance the legislature was authorized and directed to sell the railroads on' their failure to pay a tax levied, and when the sale should be made to others than the indebted companies, no limitation was directed to be affixed to the price, and such a sale, we have no doubt, would have discharged the road from the State’s lien. The State itself was empowered to become a purchaser at the sale at any price at which it could buy, and whenever it purchased, the lien, of course, was merged in the title, and the General Assembly was required to provide by law in what manner the railroad, or franchises, or other property, should be sold for the payment of the indebtedness of the company in default. But the ordinance does not require that at such sale the purchase/from the State shall pay the full amount of that indebtedness. A lien is required to be reserved for all sums remaining unpaid; that is, very clearly, for all that part of the purchase-money from the State at her sale which remain/"unpaid. If- this is not the meaning, the State maj’ neve/be able to sell at all, and the plain purpose of the ordinance may be entirely frustrated. And that such is its meaning has been •determined by the Supreme Court of Missouri.* The fifth *371 section of the ordinance does, indeed, require that no railroad or other property, or franchise purchased by the State shall be restored to the company in default until it shall have first paid in money, or in Missouri State bonds, or in bonds guaranteed by the State, all interest due from said company, and requires that all interest coming due thereafter shall be paid semi-annually in advance; but even this is no assertion that such a restoration shall not be made for a sum less than the original indebtedness. Whether it may or not it is unnecessary to decide, for the provision applies only to a case where the road has been sold, and where the State has become the purchaser, which is not this case.
Neither the clause in the body of the constitution, therefore, nor any provisions of the railroad ordinance forbid the legislature to sell the railroad, or compromise the debt claimed by the State, for less than the entire indebtedness. It follows, then, that though the legislature had no power to release the lien while the debt remained, it was not prohibited from selling the claim or commuting the debt. And there is no inconsistency in this. The legislature may well have been trusted with the management of the obligation, responsible only to its constituents, while the security for the fulfilment of the obligation may have been withdrawn' from its control. A trustee may have no right to give up a security for a claim, aud yet be at full liberty to settle and adjust the claim itself or to sell it. It need hardly be added that if the legislature had power to accept a commutation of the claim of the State, or to sell the debt for what in its judgment it deemed best for the public interests, it had also power to make a formal relinquishment of the lien after the debt had been liquidated. The constitutional provision was not designed to continue in existence liens that the law had extinguished.
For these reasons we hold that the fifth section of the act of the legislature of March 31st, 1868, was not in conflict with that provision of the constitution which forbids, for any purpose whatever, a release of the lien held by the State upon any railroad.
*372 Nor do we perceive that there is any conflict between it and the railroad ordinance. The appellants insist that the ordinance forbids any sale of a defaulting railroad except at public auction, for a price equal to the full amount of the debt of the defaulting company, and without a reservation of a lien upon the property sold, not merely for the unpaid part of the purchase-money, but for all that remains unpaid of the debt for which the property is sold. Such is not our reading of the ordinance, nor is it that of the Supreme Court of the State. We have already said that the lien required to be reserved is only to secure the unpaid balance of the purchase-money. This is too clear for argument. It is equally clear to us the ordinance does not require that the sale shall be for a price equal to the whole debt, or that it shall be at public auction. The first, second, and third sections impose upon each of three railroad companies, of which the Pacific Railroad Company is one, an annual tax of ten per centum of the gróss receipts, for two years, and fifteen per centum thereafter, until the principal and interest of the bonds for which the companies were liable should be fully paid. Then followed the fourth section, as follows: “ Should either of said companies refuse or neglect to pay said tax as herein required, and the interest or principal of any of said bonds, or any part thereof remain due and unpaid, the General Assembly shall provide by law-for the sale of the railroad and other property, and the franchise of the company that shall be thus in default, under the lien reserved to the State, and shall appropriate the proceeds of such sale to the payment of the amount remaining due.and unpaid from said company.” There is nothing in this which takes away from the legislature the power to determine the time, the mariner, or the price of the sale which it was directed to cause to be made. It is true the sale is ordered to be made under the lien reserved to the State, referring, doubtless, to the mortgage taken under the act of 1851, and it is also true that by that act it was enacted that if either of tlie companies to which bonds might be issued should make default in the payment of either principal or interest of the said bonds, the *373 governor might sell their road by auction, giving six months’ notice, or buy it in for the use of the State, but these provisions were no part of the lien. They were means specified for enforcing it. The legislature was at liberty to provide other means of collecting the debt and enforcing the lien. The sale directed by the ordinance was for non-payment of the tax imposed, and the direction to sell under the lien reserved was simply an order to proceed to collect the mortgage. The lien is not to be confounded vyith proceedings for its foreclosure.
Finally, it is insisted by the appellants that the fifth section of the act of 1868 is unconstitutional because its subject is not embraced in the title of the act, and because the constitution ordains that “ no law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title; but if any subject be not embraced in the title, such act shall be void only as to so much thereof as is not so expressed.” The title of the act of 1868 is “ An act for the sale of the Pacific Railroad, and to foreclose the State’s lien thereon, and to amend the charter thereof.” That the subject of the fifth section is embraced in this title is very apparent If the subject is not the foreclosure of the State’s lien, it is impossible to say what.it is. And we think it cannot be justly said the act embraces more than one subject. It has many details, but they all relate to one general ' subject, which is the sale of the railroad and the foreclosure of the State’s lien thereon.*
We cannot sustain this objection.
Nothing, then, in our judgment, warrants the conclusion that the fifth section of the act of March 31st, 1868, was not a legitimate exercise of the legislative power of the General Assembly of the State. It follows that the arrangement made in pursuance of it with the Pacific Railroad Company, and the deed of the governor to the company, extinguished the debt due to the State, and, consequently, put an end to the lien.
*374 The $5,000,000 paid to the State were raised upon bonds of the company and a mortgage, of which the complainants in the court below are trustees. The money was advanced on the faith of the legislation of 1868, and so were $8,000,000 more, for which a subsequent mortgage was given. If that legislation was not unconstitutional, as we have endeavored to show it was not, it would be a gross wrong to the bondholders who thus advanced their money, were the defendants permitted to sell the railroad, its property, and franchises, for the satisfaction of a claim or lien which has no longer any existence.
Decree affirmed.

 See 37 Missouri, 129.

 Cooley’s Constitutional Limitations, 141 et seq.