Kelley v. Marron, State Treasurer, 21 N. M. 239.

---

[No. 1864, November 17, 1915.]

KELLEY v. MARRON, State Treasurer.

SYLLABUS BY THE COURT.

1. The enrolled bill which has been signed by the Speaker and President of the respective houses, as required by section 20, of article 4 of the Constitution, and approved by the Governor and deposited with the Secretary of State, as required by Constitution, § 22, art. 4, is conclusive upon the courts, as to the regularity of its enactment, since the signatures of the officers are a solemn declaration by the officers of a co-ordinate department that the bill, as enrolled, was enacted and approved.

P. 240

2. Each of the three departments of government is equal and co-ordinate and responsible only to the people, and the courts are not warranted in assuming that their department is the only one to which it is safe to intrust the enforcement of the provisions of the Constitution regulating the enactment of statutes.        P. 242

3. The courts will not look beyond the properly authenticated legislative act, on file in the office of the Secretary of State, certified and signed as required by the Constitution, to the journal of either house for the purpose of determining whether such act was read in full therein, after it had been enrolled and engrossed, as required by section 20, art. 4, of the Constitution.        P. 242

4. The case of Earnest v. Sargent, 150 Pac. 1018, wherein the court held that it would look to the journal to ascertain whether an act had been passed over the Governor's veto, distinguished from the present case.        P. 262

Appeal from District Court, Santa Fé County; M. C. Mechem, Judge.

Action by Harry H. Kelley against Owen N. Marron, State Treasurer. From judgment for defendant, plaintiff appeals. Affirmed.

VAUGHT & WATSON of Deming, for appellant.

FRANK W. CLANCY, Attorney General, for appellee.

### OPINION OF THE COURT.

ROBERTS, C. J.—[1] The second legislative assembly of the state of New Mexico, by chapter 32, Laws 1915, provided for the creation of an armory board of control, and for the construction of an armory building in the village of Carlsbad, and authorized an issue of bonds to pay for such building, and, by chapter 46, Laws 1915, like provisions were made for an armory building in the village of Deming, in said state. The state treas-

urer, as required by such acts, was proceeding to advertise and sell such bonds when the present action was instituted in the court below to enjoin him from so doing, by the appellant, a taxpayer of the state. To the complaint, which set up the invalidity of the acts, a demurrer was sustained. The right of the treasurer to proceed was challenged on the ground that the said pretended legislative acts were not legally enacted, in that the journal of the House of Representatives does not show a compliance with section 20, art. 4, of the Constitution, the first sentence only of which is material, and reads as follows:

"Immediately after the passage of any bill or resolution, it shall be enrolled and engrossed, and read publicly in full in each house, and thereupon shall be signed by the presiding officer of each house in open session, and the fact of such reading and signing shall be entered on the journal."

The acts in question were signed by the respective officers of each house, and the fact of such signing appears upon the respective journals. It does not appear from such journal, however, that the bills were read in full in each house after being enrolled and engrossed, as required by the above constitutional provision. After being signed by the respective officers of each house, the bills were presented to the Governor, by him approved and signed and deposited in the office of the secretary of state.

It is contended by the Attorney General that the court cannot look behind the properly authenticated bill in the office of the secretary of state to the journal, to see whether the constitutional mandates have been complied with by the Legislature in the enactment of the laws, but that the laws, having been authenticated and promulgated by the legislative department to the public in the manner authorized by the Constitution, this is conclusive evidence of their proper passage by the Legislature.

At the outset of the discussion of the question, it is proper to state that there exists an irreconciliable conflict in the authorities upon the question. The cases discussing the question may be generally classified under four heads: First, Those holding that the enrolled act,

duly signed by the presiding officers of the two branches
of the Legislature and approved by the Governor and
lodged with the secretary of state, is conclusive, and can-
not be shown to be invalid by reference to the journals.
Second, Those which hold that the enrolled act, thus sign-
ed, approved, and deposited with the secretary of state,
is not conclusive, but that the legislative journals can be
examined to see whether the act has been constitutionally
passed. These decisions consider the journals as in the
nature of minutes, or the ultimate documentary evidence
of what was done by the Legislature, and hold, not only
that an affirmative entry upon the journal, showing a vio-
lation of the constitutional methods of enacting laws, will
invalidate an act, but also that, the journal being the
complete evidence of legislative action, silence is equiva-
lent to negation, and the failure of the journal to show
that a constitutional provision was complied with is equi-
valent to a statement that it was not complied with, and
hence is equally fatal to the act as a direct statement of
non-compliance would be. Third, Those which hold that
such enrolled act is not conclusive, and that the journals
may be examined for certain purposes, but that a failure
of the journals to show a full compliance with the consti-
tutional requirements in regard to the modes of passage of
the acts will not cause the act to be held unconstitutional,
and that this will only be done where the entries on the
journal affirmatively show that the act has not been con-
stitutionally passed. Fourth, Decisions which do not rest
upon general rules or principles, but set up as a basis the
peculiar or special language of the Constitution under
consideration. De Loach v. Newton, 134 Ga. 739, 68 S.
E. 708, 20 Ann. Cas. 342. Included in the last class
are those cases which hold that a failure to show on the
journal compliance with a constitutional requirement does
not invalidate the act, unless the Constitution directs that
such compliance must be entered on the journal.

[2, 3] As to whether the courts will, or will not,
look behind the properly authenticated act to the journal
for the purpose of ascertaining that all the constitutional

provisions relative to its enactment have been complied with, it may be stated that the courts are approximately equally divided; but public policy, reason, and logic and the modern trend of authority all support the first position. The courts which hold otherwise lose sight of the purpose and form of our government, and the independence which exists between the various departments thereof. Our Constitution, and in fact the Constitution of the Unitel States and each of the states, have provided for three great branches of government, all of equal dignity and power within their proper spheres, and each independent of the other. Certain duties of government are confided to each of these departments, which it is required and authorized to exercise within constitutional limitations, without any interference from either of the others. Upon the legislative branch of government is cast the duty of enacting such laws as are deemed calculated to promote the prosperity and happiness of the people and provide for the general welfare. The judicial department is created and endowed with the power to construe and interpret the laws and administer justice, between state and citizen, citizen and citizen, or citizen and stranger. It has no power to interfere, nor is it concerned, with the enactment of laws by the legislative department. It is true that this department determines whether an act of the Legislature conflicts with the fundamental law of the state, but this is a matter entirely foreign to the enactment of the law. The executive executes the laws, and performs certain duties which the Constitution and law impose upon it, and acts independently of either of the other departments. The officers of each department, except in certain instances, are answerable only to the people. The Constitution has conferred upon each certain broad powers, and has prescribed the manner in which those powers shall be exercised. The mandates thus given must be held to be directed only to the officers exercising the powers conferred, upon whom rests the responsibility of seeing that their acts comply with such requirements, un-

less some one of the departments of government has been created with superior powers and prerogatives and given a supervisory control over the other supposedly equal and independent departments of government.

Section 1, art. 3, of the Constitution expressly prohibits the exercise by one of the departments of government of powers belonging to another department, "except as in this Constitution expressly directed or permitted," and no express grant of power is given to the judiciary to supervise the acts and conduct of the Legislature in the passage of a legislative act.

In our Constitution the judicial department is given certain broad powers, and the jurisdiction of the various courts is defined. In certain contingencies the Supreme Court is authorized to call in a district judge to sit in place of one of the regular judges of the court. No one would contend that either of the other departments of government would have the right to question a judgment of the court, upon the ground that it did not have the right to call in a district judge who might have participated in the opinion. Could the Legislature by an act disapprove of a judgment of the Supreme Court, on the ground that some procedure prescribed by the Constitution had not been complied with? The Governor is given the right to act in a certain way upon his finding that certain facts exist. Could either of the other department-ments legally call in question his act, upon the ground that he had erroneously determined the facts upon which his action was predicated? The very statement of the assumption of the right of either of the other departments to question the acts and judgments of the judiciary is so shocking to the mind that it demonstrates the fallacy of the proposition that the judicial department has the power to go behind the duly and properly authenticated act of the Legislature to see whether there has been compliance with constitutional directions as to its method of procedure. If that proposition were correct, then the three branches of our government are not equal and co-ordinate, as generally supposed; but the judicial branch of

the government is paramount to each of the others, and is invested with the power and charged with the duty of exercising a supervisory control over both the other departments of government, and of seeing to it that such departments act and perform their functions, not according to their interpretations of the constitutional mode of doing the act undertaken, but as the judicial branch of the goevrnment may interpret the fundamental law as to the method of procedure.

· The only interpretation which is consistent with the equality and independence of the three departments of government is that such constitutional provisions are directed to them severally, and that upon the department to which the provision is directed rests the responsibility and duty of interpreting and complying therewith. The officers of the legislative department in this state are selected in the same manner and are answerable to the same power as the judiciary. The people are as well able to choose honest and capable lawmakers as they are to choose upright and righteous judges. But it is contended, that if these constitutional provisions are not applied and enforced by the courts, it will be possible for the officers of the assembly and the Governor to enact laws without the concurrence of the members of the Legislature. The answer to this contention is plain. Power must be reposed upon some one, and the reposing of such power in the officers named is greatly to be preferred to placing in the hands of the clerk of either the House or Senate, the unlimited and arbitrary power of unmaking a law, which might have received the unanimous approval of every member of each house, or to entrusting the validity of all the laws enacted to the integrity and competency of a clerk, not elected by the people, and usually unfamaliar with the duties devolving upon him under the Constitution. Is it to be presumed, and can we logically assume, that the constitutional convention intended that the journal, prepared by one man, or, as is usually the case, prepared by some stenographer acting for the clerk, seldom, if ever, read understandingly in the assembly,

should take controlling precedence over the solemn acts of the Speaker of the House, the President of the Senate, the clerks of the House and Senate, and the Governor of the state in signing and certifying to the fact that the bill duly passed and became a law? We do not believe such to have been the intention of the framers of the Constitution, and the consequences of such a construction are so fraught with evil and uncertainty, and will lead to such endless confusion, that it is clear the court should not so construe the language used, unless such is the only reasonable alternative.

Certainty as to what the law is, is greatly to be desired, both by the courts and the people. Courts take judicial knowledge of the statute law of the state, and the people are bound to know the law, at their peril. Ignorance of the law is no excuse. A legislative assembly meets and enacts certain supposed laws, which are published and distributed so that all may know what the law is. The people act under what they assume the law to be, from a reading of the published acts; courts administer the law under such supposed acts of the Legislature; no question may be raised as to a certain act under which large property interests may have been acquired, or even criminal penalties prescribed or abrogated, until long years afterwards, some inquiring individual resorts to the legislative journal and discovers that some constitutional provision, prescribing the method of procedure in the legislative assembly, is not shown to have been complied with. This, in some appropriate manner, is called to the attention of the courts, and the law is held never to have been enacted. And it must not be supposed that even one suit or action would finally settle the matter. We have several provisions in our Constitution, prescribing what the Legislature shall do in the enactment of laws. Some one might question a law because one provision had not been complied with, while another might invoke some other provision, and we would never definitely know that a statute had been enacted legally until the courts had said that each of such provisions had been complied with,

and that such fact was properly recorded in the journal, by the journal clerk. For illustration, section 12, art. 4, provides:

"Each house shall keep a journal of its proceedings and the yeas and nays on any question shall, at the request of one-fifth of the members present, be entered thereon."

Section 15, same article, provides:

"No bill, except bills to provide for the public peace, health and safety, and the codification or revision of the laws, shall become a law unless it has been printed, and read three different times in each house," etc.

Section 17, same article, reads:

"No bill shall be passed except by a vote of a majority of the members present in each house, nor unless on its final passage a vote be taken by yeas and nays, and entered on the journal."

There may be other provisions of the same import, but certainly the above are sufficient to clearly demonstrate the uncertainty which will prevail, and the endless litigation which would ensue before it would become definitely known whether a given act had been constitutionally enacted.

In the case of Ex parte Wren, 63 Miss. 512, 56 Am. Rep. 825, the court, after reviewing the adjudicated cases, said:

"Every other view subordinates the Legislature and disregards that co-equal position in our system of the three departments of government. If the validity of every act published as law is to be tested by examining its history, as shown by the journals of the two houses of the Legislature, there will be an amount of litigation, difficulty, and painful uncertainty appalling in its contemplation and multiplying a hundredfold the alleged uncertainty of the law. Every suit before every court, where the validity of a statute may be called in question as affecting the right of a litigant, will be in the nature of an appeal, or writ of error, or bill of review, for errors, apparent on the face of the legislative records, and the journals must be explored to determine if some contradiction does not exist between the journals and the bill signed by the presiding officers of the two houses. What is the law is to be declared by the court. It must in-

form itself as best it can what is the law. If it may go beyond the enrolled and signed bill and try its validity by the record contained in the journals, it must perform this task as often as called on, and every court must do it. A justice of the peace must do it, for he has as much right and is as much bound to preserve the Constitution and declare and apply the law as any other court, and we will have the spectacle of examination of journals by justices of the peace, and statutes declared to be not law as the result of their journalistic history, and the circuit and chancery courts will be constantly engaged in like manner, and this court will, on appeal, have often to try the correctness of the determination of the court below as to the conclusion to be drawn from the legislative journals on the inquiry as to the validity of statutes thus tested. * * * Let the courts accept as statutes, duly enacted, such bills as are delivered by the Legislature as their acts authenticated as such in the prescribed mode."

The above language clearly indicates the absurd results and endless confusion and uncertainty which would flow from a holding that resort could be had to the journal for the purpose of impeaching a duly authenticated legislative act.

Referring to the dangers which may attend the application of this rule, and the abuses to which it might be subjected, the Supreme Court of the United States, in the case of Marshall Field & Co. v. Clark, 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294, said:

"It is admitted that an enrolled act, thus authenticated, is. sufficient evidence of itself—nothing to the contrary appearing upon its face—that it passed Congress. But the contention is, that it cannot be regarded as a law of the United States, if the journal of either house fails to show that it passed in the precise form in which it was signed by the presiding officers of the two houses, and approved by the President. It is said that, under any other view, it becomes possible for the Speaker of the House of Representatives and the President of the Senate to impose upon the people as a law a bill that was never passed by Congress. But this possibility is too remote to be seriously considered in the present inquiry. It suggests a deliberate conspiracy to which the presiding officers, the committees on enrolled bills, and the clerks of the two houses must necessarily be parties, all acting with a common purpose to defeat an expression of the popular will in the mode prescribed by the Constitution. Judicial action based upon such a suggestion is forbidden by the respect due to a co-ordinate branch of the government. The evils that may result from the recognition of the prin-

Kelley v. Marron, State Treasurer, 21 N. M. 239.

ciple that. an enrolled act, in the custody of the secretary of state, attested by the signatures of the presiding officers of the two houses of Congress, and the approval of the President, is conclusive evidence that it was passed by Congress, according to the forms of the Constitution, would be far less than those that would certainly result from the rule making the validity of congressional enactments depend upon the manner in which the journals of the respective houses are kept by the subordinate officers charged with the duty of keeping them."

And to the same point Mr. Justice Sawyer, in Sherman v. Story, 30 Cal. 253, 89 Am. Dec. 93, said:

"Better, far better, that a provision should occasionally find its way into the statute through a mistake, or even fraud, than that every act, state and national, should at any and all times be liable to be put in issue and impeached by the journals, loose papers of the Legislature, and parol evidence. Such a state of uncertainty in the statute laws of the land would lead to mischiefs absolutely intolerable."

In the case of State v. Jones, 6 Wash. 453, 455, 34 Pac. 101; 23 L. R. A. 340, the court points out the effect of any such contention as that contended for by appellant in this case, and shows that if that were the proper doctrine, in every case the courts and all inhabitants of the state must take notice of every step or proceeding in the Legislature relating to the passage of bills so far as such steps are made obligatory upon the Legislature by the Constitution, and, with such construction once sanctioned by the courts, no individual, no matter that he had acted in good faith, could protect himself from the results of his acts if, in fact, the journals failed to show that the act had not been regularly passed; that a person might, in fact, be committing a crime when he thought he was acting directly in accordance with the law. The court then proceeds as follows:

"That such must be the result, if the signing by the presiding officers and the approval by the Governor are to be considered only as steps in the act of making the bill a law, and not in themselves proof of such fact, seems clear under well-settled rules relating to construction. If such signing and approval are only steps, then the fact that they have been taken in no manner proves that any other required step has been taken, and it must follow that before

Kelley v. Marron, State Treasurer, 21 N. M. 239.

the courts can find that the bill has become a law, they must look and see that all the steps required by the Constitution to constitute it such have been observed by the Legislature. Such a construction given to the enrolled act would render it practically impossible for the courts even to determine what was the law, and would render it absolutely impossible for the average citizen to ascertain that of which he must at his peril take notice. There is enough injustice in requiring the citizen to take notice of the statute law, when to do so he has only to determine the legal effect of the enrolled acts on file in the office of the secretary of state, and if he is further required to take notice of all that is shown by the journals of the Legislature which may affect the regularity with which such acts have been passed, he will indeed be in a sorry condition. * * *

"It follows that, as a matter of public policy as well as of convenience and certainty, the court should adopt the rule which makes such enrolled bills conclusive evidence of their regular enactment, if it can do so without violating some fundamental constitutional provision or well-settled rule of construction. As we have already stated, none of the cases cited by respondent go to the extent of holding, as first above suggested, that the enrolled act on file is proof of nothing at all, and that the fact of its being thus found on file must be supplemented by the further affirmative finding from the journals that it has been regularly enacted before it can be given any force whatever, nor have we been able to find any cases going to that extent. We may therefore dismiss that construction from further consideration, though to us it seems to follow more logically from the course of the argument of respondent than does that upon which, under the authorities, he must rest his case.

"As a basis for our further discussion, then, it may be accepted as a fact that all of the courts hold that these enrolled bills are prima facie the law, and that they must be given force as such until their invalidity is suggested in some proceeding. Yet to hold that this prima facie presumption attaches, and a conclusive one does not, seems to us to be illogical in the highest degree. Beside, there is something ridiculous in holding that there can be such a thing as a prima facie law. It is true that it is frequently the duty of courts and citizens to accept certain things as prima facie proof of what the law is, but that is an entirely different proposition from holding that a certain thing is prima facie a law. An act of the Legislature, when regularly on file in the office of the secretary of state, is, and must necessarily be, either a law or not a law, and it is preposterous to hold that that which is the law is so only prima facie, or to hold that that which is in fact not a law is even prima facie so. What constitutes the statutory law of a state must necessarily be an absolute proposition, and not simply a prima facie one."

Kelley v. Marron, State Treasurer, 21 N. M. 239.

The Constitution of Montana provides that the presiding officer of · each house shall, in the presence of the house, sign all bills immediately after their titles have been publicly read, "and the fact of signing shall be at once entered upon the journal." Article 5, § 27. In a case decided by the Supreme Court of that state the journal omitted to show the fact that the bill was signed by the presiding officer of each house, although the enrolled bill bore the signature of the presiding officers. It will be seen that the constitutional provision was quite as strong and mandatory as the one in our Constitution. The Montana court disposes of the question in the following language:

"The presumption is that the Legislature and the officers thereof did their duty, and that the enrolled bill was regularly passed. This presumption is strong, and is indulged in by the judicial branch of the government as necessary to the 'peace and good order of the state.' Whatever may be the rule in respect to the power of the court to go back of an enrolled bill where it is directly charged that the journal misrepresents facts, yet in a case where the journal simply omits to affirmatively show that an act was done which ought to have been done, by the rule of the Constitution prescribing the observance of a form of proceeding by the Legislature, the courts cannot go behind the enrolled bill to ascertain whether such forms were observed, and will rely upon its attendant presumptions of regularity." State v. Long, 21 Mont. 26, 35, 52 Pac. 645, 648.

The constitution of Tennessee provides that:

"No bill shall become a law until it * * * shall have been signed by the respective Speakers in open session, the fact of such signing to be noted in the journal." Article 2, § 18.

The Supreme Court of that state made some comment upon the fact that this clause did not use the mandatory word "shall," which was used in other portions of the same section, but this distinction does not seem to be sound. The court held that the bill in question was valid, although the journal did not show the fact of the signing, and speaks as follows:

"An opposite view and contrary holding would lead to confusion and disastrous results, in view of our legislative history. It would put it in the power of the journal clerk of either house, by design or negligence, to nullify any legislation, no matter how important, by simply omitting the necessary entry upon the journal, or erasing or changing an entry already made; and this latter could easily be done, inasmuch as bills are simply referred to by their number.

"It appears from the certificate of the secretary of state that the omission we are now considering is made in 176 acts passed at nine sessions of the general assembly. Many of these are the most important laws upon our statute books. Public policy, therefore, suggests that this provision of the Constitution should be held to be merely directory, and not mandatory; and such is our construction. Acts bearing the signatures of the Speakers, and approved by the Governor, will be treated as properly passed, unless the contrary is shown by the journals. We are of opinion, therefore, that the act in question is not unconstitutional because of the defect pointed out and complained of.". Telegraph Co. v. Nashville, 118 Tenn. 1, 15, 101 S. W. 770, 773 (Ann. Cas. 824).

A decision of the Supreme Court of New Jersey may perhaps be considered the leading case in state authorities. In that case it is shown that the Constitution of the state required each house to keep a journal of its proceedings, and that the ayes and nays on any question should, at the desire of one-fifth of those present, be entered on the journal, and also that the ayes and nays of the members' vote on the final passage of a bill should be entered on the journal. It is said that these are all the constitutional requirements as to the journals. The court then says that it is impossible not to incline to the opinion that the framers of the Constitution did not design to create records which were to be paramount to other evidence with regard to the enactment and contents of laws, and that at the time of the formation of the Constitution, an act enrolled in the office of the secretary of state was conclusive as to the existence and provisions of the law which it embodied, in this regard following the general English rule as to acts of Parliament. The court goes on to consider, among other things, the unreliable character of legislative journals, and to show that if they are to be resorted to at all, their effect would be uncontrollable, as the idea that upon this subject the

courts need listen to parol proof is totally inadmissible. The opinion in the case is quite lengthy, but is well worth reading in its entirety, and is highly instructive as to the principles which should be applicable to any such question as is involved in the present discussion. The following quotation ought, however, to be of some value at this place:

"In addition to the foregoing observations, I cannot close this part of my examination of the question under discussion without adverting to a further consideration, which, to my mind, appears to be entitled to very great, if not decisive, weight. I here allude to the circumstance that, in the structure of the government of this state, the judicial and legislative departments are made co-equal, and that it nowhere appears that the one has the right of supervision over the other. It is true, as was much pressed on the argument, that the legislative branch may wilfully infringe constitutional prescriptions. But the capacity to abuse power is a defect inherent in every scheme of human government, and yet, nevertheless, the forces of government must be reposed in some hands. The prerogatives, to make, to execute, and to expound the laws, must reside somewhere. Depositaries of those great national trusts must be found, though it is certain that such depositaries may betray the confidence thus reposed in them. In the frame of our state government, the recipients and organs of this three-fold power are the Legislature, the executive, and judiciary, and they are co ordinate —in all things equal and independent; each, within its sphere, is the trusted agent of the public. With what propriety, then, is it claimed that the judicial branch can erect itself into the custodian of the good faith of the legislative department? It is to be borne in mind that the point now touched does not relate to the capacity to pronounce a law, which is admitted to have been enacted, void by reason of its unconstitutionality. That is clearly a function of judicature. But the proposition is whether, when the Legislature has certified to a mere matter of fact, relating to its own conduct and within its own cognizance the courts of the state are at liberty to inquire into or dispute the veracity of that certificate. I can discover nothing in the provisions of the Constitution, or in the general principles of government, which will justify the assumption of such superior authority. In my opinion, the power to certify to the public the law itself has enacted is one of the trusts of the Constitution to the Legislature of the state." Pangborn v. Young, 32 N. J. Law, 29, 36-39, 40, 41.

See, also, Cable Co. v. Attorney General, 46 N. J. Eq. 270, 276, 19 Atl. 733, 19 Am. St. Rep. 394.

A comparatively recent decision of California is of special interest, as it reviews earlier decisions in the state, the first of which (Fowler v. Pierce, 2 Cal. 165) held that the court could go behind the enrolled bill and inquire whether it was passed or approved in accordance with the Constitution. While the later cases overruled that decision and held that neither the journal nor the bill originally introduced, nor parol evidence, could be received as against the properly enrolled and authenticated bill deposited with the secretary of state. County of Yolo v. Colgan, 132 Cal. 265, 275, 64 Pac. 403, 407 (84 Am. St. Rep. 41).

The court said:

"The law-making power of the state is vested, by the Constitution, in the Legislature; and, while the Constitution has prescribed the formalities to be observed in the passage of bills and the creation of statutes, the power to determine whether these formalities have been complied with is necessarily vested in the Legislature itself, since, if it were not, it would be powerless to enact a statute. The Constitution has not provided that this essential power thus vested in the Legislature shall be subject to review by the courts, while it has expressly provided that no person charged with the exercise of powers properly belonging to one of the three departments—the legislative, executive, and judicial—into which the powers of the government are divided, shall exercise any functions appertaining to either of the others. In Pangborn v. Young, supra, the Constitution provided, as to the form of enacting bills, 'that the yeas and nays of the members voting on such final passage shall be entered on the journal,' and is therefore directly in point here."

Indiana is one of the states which supports our conclusion. In a case in 1869 the court said that the questions necessary to be considered were:

"(1) Must the courts of this state take judicial knowledge of what is and what is not the public statutory law of the state? (2) When a statute is authenticated by the signatures of the presiding officers of the two houses, will the courts search further, to ascertain whether such facts existed as gave constitutional warrant to those officers to thus authenticate the act as having received legislative sanction in such manner as to give it the force of law "

As to the first of these questions the court held, of course, that it must take judicial knowledge of what is

Kelley v. Marron, State Treasurer, 21 N. M. 239.

the law, as even the private citizen must know it at his peril. The particular objection which was being urged in that case was that the bill was passed by less than a quorum of the House of Representatives, and that this fact was shown by the journals, in connection with other evidence which was presented. The opinion points out that courts should be very careful not to invade the authority of the Legislature, and that anxiety to maintain the Constitution, no matter how laudable, must not lessen their caution in that particular, because, by overstepping the authority which belongs to them and assuming that which pertains to the Legislature, they would violate the very Constitution which thereby they seek to preserve and maintain, as no person charged with official duties under the judicial department can exercise any of the functions of the legislative department. The court then speaks as follows:

"Such journals, it is notorious, are, and must be, made in haste, in the confusion of business, and are often inaccurate. Their reading is frequently omitted from day to day, so that those errors go without correction. They do not show the nature of the bill as introduced, but merely the amendments which have been proposed to it. They are not required to contain anything by which it could be even identified and its passage traced. They are not required to show whether or not a quorum is present. Journals such as these had been kept by the Legislature of this state from the beginning. The convention which framed the present Constitution must be supposed to have had knowledge of these things. Can the opinion be entertained that they meant that the journals, necessarily imperfect and incomplete memorials, should, as evidence, override the solemn attestation of the passage of a bill, which they were so careful to require, by the presiding officers? Or can it be supposed that they meant that two records should be looked to as concurrent proofs of the same fact, and yet made no provision for guidance when these should happen to be in conflict? By what reason or analogy can we sustain ourselves in holding that the journal should override the signatures upon the enrolled act? Surely not because it is, in the nature of things, more likely to speak the whole truth upon the question in hand. Surely not because it is a rule that the truth of any other record in the world, attested as the law requires to make it proof, may be successfully combated by something else, not made by law superior to the attestation of the proper officer." Evans v. Browne, 30 Ind. 514, 519, 524, 525, 95 Am. Dec. 710.

It is believed that the Indiana courts have never departed from the wholesome rule laid down in the case from which the foregoing quotations have been made. Bender v. State, 53 Ind. 254; Commissioners v. Burford, 93 Ind. 384; Evansville v. State, 118 Ind. 426, 434, 21 N. E. 267, 4 L. R. A. 93; Commissioners v. Boice, 140 Ind. 506, 513, 514, 39 N. E. 64, 40 N. E. 113; Telegraph Co. v. Taggart, 141 Ind. 281, 284, 40 N. E. 1051, 60 L. R. A. 671; Lewis v. State, 148 Ind. 346, 350, 47 N. E. 675.

In a Kentucky case it was urged that a statute was not valid because on the final passage in the senate—.

"the vote was not taken by ayes and nays and entered in the journal as required by section 46 of the Constitution."

The bill, properly enrolled, was signed by the presiding officers, and signed and approved by the Governor, and the court says that the question was, "Can a law thus promulgated be impeached by reference to the journals of either house?" The court calls attention to the fact that this was not a case where the enrolled bill was in any way different from the bill actually adopted, and was therefore unlike Field v. Clark, 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294, and State v. Chester, 39 S. C. 307, 17 S. E. 752, in which cases, cited as samples of many others to the same effect, it was held that the official attestation of the presiding officers of the legislative bodies and of the executive are conclusive, although they leave undetermined, in express terms, the further question as to whether an act may be impeached if the journals fail to show that which the Constitution expressly requires them to show, such as that the bill was passed by an aye and nay vote. The court says:

"An examination of these cases, however, shows that the argument against the use of the journals to show that the bill was not the same as that actually adopted is quite conclusive against their use to show the absence of the steps contemplated by the organic law. And we may observe, in this connection, it would be strange if it were otherwise; for why should the journals, if deemed capable of shedding light on any question touching the bill, be rejected as evi-

dence affecting the substance (the very bill itself), and held competent to affect the mere steps in the process of passing it? Indeed, does there not seem to be stronger reasons for seizing hold of the journals to expose the fraud of promulgating as valid a law which had in fact never passed at all than for using them to undermine a law because of flaws in the steps taken during its passage? * * *

"In the first place, no court can begin its scrutiny of the manner in which the legislative department may have performed the details of its work, as shown by its daily journals, without a sense of assumed superiority or without seeming to arrogate to itself a supervisory power wholly inconsistent with the fundamental truth that the departments are equal and independent in their respective spheres. Surely must the passing of bills, and all the accompanying minutiae, be exclusively legislative processes. Courts do not make laws or pass bills; and the various steps required by the organic law taken seem, in the nature of things, to call for the exercise of legislative and not judicial functions.

"The judiciary, at every step of its investigation into the journals of a legislative body, must find itself confronted with the embarrassing question, How is it that the courts have come to be the exclusive guardians of those mandatory provisions of the Constitution which direct the Legislature only how to transact its business? The answer must be more embarrassing because such a thing cannot be except on the assumption that the courts must regard themselves as alone competent for such oversight. It is to be admitted that unless the constitutional mandate is followed, 'no bill can become a law.' The Constitution so says. But the question remains, What shall be taken by the courts as the basis of judicial knowledge? Must they look to the journals and accept as conclusive the hasty memoranda of the clerk or his assistant, or shall they assume that the Legislature obeyed the Constitution and accept as conclusive the certifications of its presiding officers? That the act or successive acts of some agency somewhere or somehow must be held conclusive is entirely evident, unless we open the doors to all competent proof, including that of the members on the floor, an absurdity not to be thought of. The result is we must accept as conclusive either the entries of the clerk in the journals, or the more deliberate acts of the presiding officers." Lafferty v. Huffman, 99 Ky. 81, 35 S. W. 123, 32 L. R. A. 203.

The whole opinion in this Kentucky case is interesting and instructive, and the conclusion reached appears on page 92 of 99 Ky. on page 126 of 35 S. W., 32 L. R. A. 203, and is as follows:

"From every point of reason, therefore, we are convinced that the enrolled bill, when attested by the presiding officers as the law requires, must be accepted by the courts as the very bill adopted by the Legislature, and that its mode of enactment was in conformity to all constitutional requirements. When so authenticated it imports absolute verity and is unimpeachable by the journals."

In an earlier case in Nevada the question is discussed at considerable length, and the conclusion reached is shown in the last paragraph of the opinion in the following language:

"From this discussion it appears that the decided weight of authority, as well as every consideration of expediency, is opposed to the doctrine that this, or any court, for the purpose of informing itself of the existence or terms of a law, can look beyond the enrolled act certified by those officers who are charged by the Constitution with the duty of certifying, and therefore, of course, with the duty of deciding what laws have been enacted." State v. Swift, 10 Nev. 176, 200, 21 Am. Rep. 721.

Later cases in Nevada adhere to the same position. State v. Glenn, 18 Nev. 34, 38, 39, 1 Pac. 186; State v. Beck, 25 Nev. 68, 79, 80, 56 Pac. 1008; State v. Howell, 26 Nev. 93, 99, 100, 64 Pac. 466.

In Mississippi a case arose involving the validity of a constitutional amendment as to which it was contended, although it had been approved by the people at an election, that it had not become a part of the Constitution because the original bill did not receive the vote of two-thirds of all the members of the Senate, as was required by the Constitution. The bill, properly signed by the presiding officers and by the Governor, was on file in the office of the secretary of state. This would seem to present a much stronger case for investigation by the courts beyond and outside of the enrolled bill than almost any other which can be found, but the court, in a somewhat lengthy opinion, upheld the validity of the passage of the bill, and said—

"that when the record of an act of the Legislature has the sanction which the Constitution has provided in order to its validity, the same presumptions of law as to the compliance with incidental forms, and the same reasons of public policy in its favor, which give sanctity to the statements of the

Kelley v. Marron, State Treasurer, 21 N. M. 239.

record of a judgment of a court, demand that it should be held to have been enacted, as the officers charged with the duty have attested that it was enacted, in conformity to the provisions of the Constitution." Green v. Weller, 32 Miss. 650, 691.

In later cases the same court refused to resort to the journals to ascertain whether the true state of facts was in accord with the enrolled and authenticated bill. Swann v. Buck, 40 Miss. 268, 295, 296; Ex parte Wren, 63 Miss. 512, 528, 533, 56 Am. Rep. 825; Hunt v. Wright, 70 Miss. 298, 303, 304, 11 South. 608.

There is a case of Brady v. West, 50 Miss. 68, which departs from the sound views announced in the other Mississippi cases, but this case is expressly overruled in the opinion in Ex parte Wren, above cited.

In Louisiana it is required that a statute must be promulgated in order to be effective, and the courts there have held that they will presume that all constitutional rules for the passage of laws have been complied with by the lawmakers, and that the laws, when promulgated, will be accepted without inquiry as to the observance or non-observance of such rules. Lottery Co. v. Richoux, 23 La. Ann. 743, 744, 745, 8 Am. Rep. 602; Whited v. Lewis, 25 La. Ann. 568, 569.

A case in South Carolina is particularly interesting because it overrules two earlier decisions which are declared to be most unsatisfactory, there having been a strong dissenting opinion in each, quotation being made from one of those dissenting opinions, the court adopting the view therein expressed. That quotation was as follows:

"It is an entire mistake to suppose that this rule rests upon the idea that any peculiar sanctity should be attached to the great seal of the state. The question to be determined in cases of this kind is one of fact—what are the terms which have been used by the Legislature in a statute, not what the construction of admitted terms should be, nor whether certain requirements of the Constitution have been complied with, which are questions clearly within the scope of judicial cognizance. If an act as enrolled, signed by the officers of the two houses, with the seal of the state attached, and bearing upon its face the approval of the Governor, is not to be regarded as conclusive of the terms it contains, then, indeed, is the question as to what is the written

law of the land involved in the greatest uncertainty. If courts can go behind such an act and inquire whether each and every word of it has actually received the assent of the Legislature, then the question very naturally occurs, How far can they go, and what kinds of evidence may be resorted to? Are the journals conclusive, or can they, as is said to have been done in one of the Illinois cases (Turley v. County of Logan, 17 Ill. 151), receive parol evidence, and in recollection of members and by the manuscript notes of the clerk amend the journals and then alter the terms of the enrolled act? If so, then rights which depend upon a statute are held by the most shifting and uncertain terms. * * * But if it should be argued that the journals are to be regarded as conclusive, and that no other evidence can be received, then the question very naturally arises, why should the journals, made up, as they are, hastily, amidst the excitement and confusion incident to most legislative bodies, by subordinate officers of the two branches of the General Assembly, be entitled to any more credit than the enrolled act reported by committees of the bodies themselves as correctly enrolled and ready for ratification and authenticated by the signatures of the presiding officers?" State v. Chester, 39 S. C. 307, 313, 314, 17 S. E. 752.

In a late case (Allen v. State, 14 Ariz. 458, 130 Pac. 1114, 44 L. R. A. [N. S.] 468), The Arizona Supreme Court adheres to the doctrine that the duly authenticated act is conclusive, and that the courts will not look beyond it at the journal, or inquire into the acts of the secretary of state in submitting an initiated measure, for the purpose of impeaching the law. In that case the court, after citing many cases upholding the validity of the authenticated acts, said:

"The cases cited may be distinguished in particulars, but the principle announced and adhered to is that the judicial department must keep within its sphere; that it must not arrogate to itself a superiority over the other two co-ordinate and co-equal departments of the government, and erect itself into a tribunal to watch with jealous scrutiny the acts confided by the fundamental law to another department; in short, the doctrine that the records of the legislative and executive departments of the government, when promulgated and authenticated and deposited with the legal custodian thereof, as provided in the Constitution, import a verity which is conclusive upon the judicial department, and which record may not be impeached by any evidence aliunde such record is sturdily vindicated in them all.

"Indeed, the courts that have taken a contrary view are generally receding from the position. In an Illinois case the

court says: 'We are not, however, prepared to say that a different rule might not have subserved the public interest equally well, leaving the Legislature and the executive to guard the public interest in this regard, or to become responsible for its neglect.' People v. Starne, 35 Ill. 121, reading at page 136, 85 Am. Dec. 348.

"In State ex rel. Casper v. Moore, 37 Neb. 13, 55 N. W. 299, occurs the following: 'Were the question a new one in this state, we would say that a bill duly deposited in the office of the secretary of state, bearing the signatures of the presiding officers of the respective houses of the Legislature and of the governor, imports absolute verity, and that the courts could not look beyond the signatures of these officers to ascertain what either house has done as to any items in said bill.'

"Mr. Sutherland, in the latest edition of his work on Statutory Construction, says: 'It is no longer true that "in a large majority of the states" the courts have held that the enrolled act may be impeached by a resort to the journals. A comparison will show that the courts are now about equally divided on the question. The current of judicial decisions in the last 10 years has been strongly against the right of the courts to go back of the enrolled act. Undoubtedly the decision of the Supreme Court of the United States in Field v. Clark has had much to do in creating and augmenting this current; but it may also be due to the greater simplicity, certainty, and reasonableness of the doctrine which holds the enrolled act to be conclusive. Many courts and judges, while feeling compelled to follow former decisions holding that the enrolled act may be impeached by the journals, have done so reluctantly, and have expressed doubts as to the validity of the doctrine, and in many cases, as will appear in the following sections, have qualified and restricted it in important particulars.' 1 Sutherland, Stat. Constr., p. 72 (2d ed.) by Lewis."

In a Maryland case (Ridgely v. Mayor, etc., of Baltimore, 119 Md. 567, 87 Atl. 909, decided in 1913), the court, while adhering to earlier cases, holding that the court will look beyond the authenticated act to the journal, said:

"Many of the courts hold (and this seems to be the trend of modern authorities) that the authentication of the act conformable to the Constitution is conclusive and unimpeachable evidence that the statute was legally passed."

In an Iowa case (State v. Lynch, 151 N. W. 81, L. R. A. 1915D, 119), decided in February of the present year, that court, in considering a similar question said:

"Each of the three departments of our government is equal, and each should be responsible to the people whom it represents. The Legislature enacts laws and is commanded by the Constitution to enact them in a certain way. The executive enforces the laws, and by the Constitution it is made his duty to take certain steps looking towards such enforcement in the manner prescribed therein upon the happening of certain contingencies. The judicial department is charged with the duty of interpreting the laws adjudging rights and obligations thereunder. Such being the respective duties of the several departments, it would seem that, when certified to have been performed as required by the Constitution, this should be conclusive on the other departments, and there would seem no more impropriety in the Legislature seeking to go behind the final record of a court to determine whether it had obeyed some provision of the Constitution in making such record than there would be in the courts seeking to go behind the final record made by the legislative department."

It seems hardly necessary that we should incumber this opinion with further quotations from cases, and certainly further argument would serve no good purpose, in view of the fact that the question has been so often before the courts, and practically everything has been said upon both sides of the question that could elucidate the conflicting doctrines. Many of the cases, dealing with the question, will be found collected in case notes to the following cases, viz.: Palatine Insurance Co. v. Northern Pacific Ry. Co., 9 Ann. Cas. 579; De Loach v. Newton, 20 Ann. Cas. 342; Atchison, Topeka & Santa Fe. Ry. Co. v. State of Oklahoma, 40 L. R. A. (N. S.) 1; Allen v. State of Arizona, 44 L. R. A. (N. S.) 468; Re Drainage District No. 1, L. R. A. 1915A, 1210; State ex rel. Hammond v. Lynch, L. R. A. 1915D, 119.

[4] One other observation, however, should be made in view of the holding of this court in the case of Earnest v. Sargent, 150 Pac. 1018, which it is suggested commits this court to the doctrine contended for by appellant. In that case the court did resort to the legislative journals for the purpose of ascertaining whether a purported legislative act had received the concurrence of two-thirds of the members present and voting in each house. The bill was passed over the Governor's veto, under the provisions of section 22, art. 4, of the Constitution, which,

after dealing with the veto and the return of the bill to the house in which it originated, further provides:

"And such bill shall not become a law unless thereafter approved by two-thirds of the members present and voting in each house by yea and nay vote entered upon its journal."

Neither the Constitution nor any statute of the state, makes any provision for the certification of a bill thus passed over the veto of the Governor, and consequently the court was compelled to resort to the journal for proof of the due passage of the act. Had the Constitution, or some statute, made provision for the certification of such a bill, as do the statutes of the United States, then no resort to the journal would have been necessary or permissible.

Indiana is one of the states which, as heretofore pointed out, has unalterably adhered to the doctrine that the courts will not go behind the properly authenticated enrolled and engrossed bill, filed in the office of the secretary of state, and yet that court resorted to the journals of the two houses to determine whether an act had been passed over the veto of the Governor, in the case of City of Evansville v. State ex rel. Blend, 118 Ind. 426, 21 N. E. 267, 4 L. R. A. 93, as did this court in the Earnest Case. The court said:

"The act passed both branches of the General Assembly, was duly signed by the two presiding officers, and presented to the Governor. He returned it without his signature, and with objections, to the House of Representatives, the house wherein it originated; his objections were entered at large on the journals, and the bill reconsidered and passed by a majority of all the members elected to that house. It was then sent to the Senate, with the Governor's objections, reconsidered, and approved by a majority of all the members elected to that house. The moment it passed the Senate it became a law. Thus reads the Constitution, article 5, section 14: 'Every bill which shall have passed the General Assembly shall be presented to the Governor; if he approve, he shall sign it, but if not, he shall return it, with his objections, to the house in which it shall have originated, which house shall enter his objections, at large, upon its journals, and proceed to reconsider the bill. If, after such reconsideration, a majority of all the members elected to that house shall agree to pass the bill, it shall be sent, with the Gover-

nor's objections, to the other house, by which it shall likewise be reconsidered; and if approved by a majority of all the members elected to that house, it shall be a law.'

"The Constitution does not require that it again be signed by the presiding officers of the two houses, transmitted to the Governor and by him filed in the office of the secretary of state. The reconsideration of a bill which has received the Governor's condemnation, by either branch of the General Assembly, is for such branch to further consider and act upon. it, and when this is done and the bill has passed both houses by the required majority, the constitutional provision has been complied with. The evidence as to the passage of the bill is to be found in the journals of the two houses. Evans v. Browne, 30 Ind. 514 [95 Am. Dec. 710], Bender v. State, 53 Ind. 254, and Board, etc., v. Burford, 93 Ind. 383, are not in opposition to the conclusion as here stated. Those cases rest upon section 25, art. 4, of the Constitution, which reads as follows: 'A majority of all the members elected to each house shall be necessary to pass every bill or joint resolution; and all bills and joint resolutions so passed shall be signed by the presiding officers of the respective houses.'

"The one constitutional provision requires that the bill be signed by the presiding officers of the two houses, and the other that it shall become a law when it has been reconsidered and has passed the two houses by the required majorities."

The distinction pointed out disposes of this contention, and requires no further discussion. Finding no error in the record, the judgment is affirmed; and it is so ordered.

HANNA and PARKER, J.J., concur.