529 P.2d 745

**Maurice Malcolm DILLON, Plaintiff-Appellant,**

v.

**Bruce KING, Governor, et al., Defendants-Appellees.**

No. 9895.

Supreme Court of New Mexico.

Dec. 6, 1974.

Maurice Malcolm Dillon, pro se.

David L. Norvell, Atty. Gen., Jane E. Pendleton, Asst. Atty. Gen., Santa Fe, for defendants-appellees.

## OPINION

STEPHENSON, Justice.

Plaintiff-appellant (Dillon), in a declaratory judgment action, challenged the constitutionality of §§ 3–8–17 to 3–8–26.1, N. M.S.A.1953 (Supp.1973) (originally enacted as Ch. 228 [1973] Laws of N.M. 833), upon a variety of grounds. From an adverse judgment, he appeals. We affirm.

Section 3–8–24.1 requires one who desires to become a candidate in a primary election to file nominating petitions with his declaration of candidacy. By the petition form prescribed, the signer certifies that he is a registered voter and a member of the political party whose nomination the candidate seeks. A declaration is also elicited from the signer that he has not and will not sign nominating petitions for other candidates seeking the same office. Section 3–8–24.4 specifies the number of signatures required. The "total vote for the party's candidates for governor at the last preceding primary election at which the party's candidate for governor was nominated" is the key figure. Candidates for

the United States Senate and other state-wide offices are required to file petitions bearing signatures in a number equal to at least three percent of such "total vote." Moreover, the signatures must include a number "equal to at least one per cent [1%] of the votes of the party of the candidate in each of at least ten [10] counties * * *."

For United States Representative, the three percent figure applies, but only to the "total vote" in the congressional district. The one percent figure also applies but only as to five counties in the district.

Section 3–8–24.4 provides for the number of signatures required for various other offices whose bailiwick is less than the entire state, but Mr. Dillon's petition only expresses interest in the Congress or a state-wide state office. Suffice it to say that as to such offices, the three percent figure still applies but only as to the area of the state pertaining to that particular office.

At the time of the 1972 primaries, there were 265,491 registered Democrats of whom 128,159 voted in the 1970 gubernatorial primary and 118,924 registered Republicans of whom 56,278 voted in the same primary. A candidate in the Democratic party primary (Mr. Dillon testified he had been a Democrat for about two years) in a state-wide race would have needed 3,846 signatures. For Representative in Congress from Mr. Dillon's congressional district, 2,049 signatures were required. The parallel figures for candidates in the Republican primary were 1,689 and 1,091.

The statutes in question have had an interesting legislative and judicial history in which Mr. Dillon has played an active role. The predecessor statute required the filing of a declaration of candidacy and the payment of a rather modest filing fee for the offices with which we are concerned—six percent of the first year's salary. Ch. 240, § 176 [1969], Laws of N.M. 957, 1057. There was no alternative available to the filing fee method as there is today. See § 3–8–24.7, N.M.S.A.1953 (Interim Supp. 1974).

Mr. Dillon and two others, expressing a desire to become candidates in the Democratic party primary for the United States Senate, attacked the prior statute in federal court. They claimed to be too poor to pay the filing fee and that they were thereby deprived of the equal protection of the law under the fourteenth amendment to the Constitution. Trial before a three-judge panel culminated in a final judgment restraining the Secretary of State from enforcing the statute, as it then existed, against Mr. Dillon and his co-plaintiffs should they file a declaration of candidacy for the office of United States Senator in the 1972 primary election. Dillon v. Fiorina, 340 F.Supp. 729 (D.N.M.1972). We held in State ex rel. Apodaca v. Fiorina, 83 N.M. 663, 495 P.2d 1379 (1972) that the predecessor statute was constitutional, but in deference to the decision in Dillon v. Fiorina, Mr. Dillon and his co-plaintiffs were exempted from payment of filing fees. The federal panel, sua sponte, then exempted all candidates in the Senate race from payment of filing fees. State ex rel. Apodaca v. Fiorina was appealed to the United States Supreme Court. The Legislature then repealed the statute requiring payment of filing fees and enacted the statutes whose constitutionality we here consider. The United States Supreme Court recently handed down its opinion in Lubin v. Panish, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974). Based upon Lubin, State ex rel. Apodaca v. Fiorina was remanded for further consideration. Since the statute requiring payment of filing fees had been repealed and replaced by the statutes presently under consideration, we vacated the judgment in State ex rel. Apodaca v. Fiorina and dismissed the case. 86 N.M. 494, 525 P.2d 854 (1974). The saga continues with this appeal.

Mr. Dillon now complains that the present statute is, as a practical matter, more onerous than its predecessor. Perhaps it is. But the practicalities of the situation have been divorced from the law on the subject by the mentioned opinions. The filing fee requirement, in the absence of

reasonable alternatives, was held to be unconstitutional in Lubin, although as a practical matter, we think any serious candidate with a modicum of support could raise a reasonable fee. True, the present arrangement may be more onerous, but the salient feature is that the Supreme Court has held the petition method to be constitutional. Lubin v. Panish, supra; Jenness v. Fortson, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).

■ Mr. Dillon is thus hoist with his own petard. He apparently claims that any procedure by which a candidate is required to do anything other than simply declare his candidacy is an impermissible deprivation of equal protection under the fourteenth amendment. This position is not only patently absurd, but is unsupported by the case law.

■ Pursuant to article I, sections 2 and 4 of the United States Constitution, each state has a wide discretion in the formulation of an elective system for the choice by the people of representatives in Congress. United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). Accordingly, this state has the authority to regulate the manner of conducting elections by enacting "such laws as will secure the secrecy of the ballot, the purity of elections, and guard against the abuse of elective franchise." N.M.Const. art. 7, § 1.

In People's Constitutional Party v. Evans, 83 N.M. 303, 305, 307, 491 P.2d 520, 522, 524 (1971), we recognized that:

"Free and open elections do not require a total lack of restraint on the number of political parties and nominees entitled to placement on the ballot.

\* \* \* \* \* \*

"The State has a legitimate interest in trying to determine some degree of good faith on the part of electors who sign nominating petitions, and in assuring at least a modicum of support for a political party and its nominees whose names are placed on the general election ballot."

■ The state also has a legitimate interest in regulating the size of the ballot so as to minimize voter confusion and to prevent the overwhelming of voting machines. See Thomas v. Mims, 317 F.Supp. 179, 182 (S.D.Ala.1970); Wetherington v. Adams, 309 F.Supp. 318, 321 (N.D.Fla.1970).

The United States Supreme Court has acknowledged the state's interest in keeping its ballots within manageable, understandable limits. Lubin v. Panish, supra; Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). As Chief Justice Burger said for a unanimous court in Lubin: .

"That 'laundry list' ballots discourage voter participation and confuse and frustrate those who do participate is too obvious to call for extended discussion. The means of testing the seriousness of a given candidacy may be open to debate; the fundamental importance of ballots of reasonable size limited to serious candidates with some prospects of public support is not. Rational results within the framework of our system are not likely to be reached if the ballot for a single office must list a dozen or more aspirants who are relatively unknown or have no prospects for success." 94 S.Ct. at 1319-1320.

The "laundry list" ballot, as it has been aptly characterized by the Chief Justice, is a real and present danger in New Mexico. Our electoral history vividly demonstrates that unrestricted primaries, such as those for which Mr. Dillon contends, foster a rank and verdant growth of candidates. For example, in the 1972 primary race for the Senate nomination of the Democratic party in which (under the federal decree) no filing fee could be charged, twenty-eight candidates filed of whom twenty-five completed the course. The votes polled ranged from 45,648 for the successful candidate, Mr. Jack Daniels, to the least successful, Mr. Thomas S. El Diferente Macaione, who trailed with 252 votes. By way of comparison, in the parallel race for the nomination of the Democratic party for

the House of Representatives, in which a filing fee was still required by our decision in State ex rel. Apodaca v. Fiorina, there were only five candidates and the vote ranged from 27,109 for the winner, Mr. Eugene Gallegos, to a respectable 3,570 for Ms. Sparkle Plenty, who brought up the rear.

In the recent election for Mayor of Albuquerque, a non-partisan with a runoff, but with unrestricted filing, thirty-three candidates filed of whom thirty came out of the starting gate.

Whether this proliferation of candidates in unrestricted filing situations prevails elsewhere to the same degree we are not prepared to say, but it is a demonstrable fact in New Mexico.

In holding the California filing fee system invalid because of the absence of reasonable alternative means of access to the ballot, the Supreme Court in Lubin went on to set out alternatives it would consider to meet constitutional standards:

"* * * we note that there are obvious and well known means of testing the 'seriousness' of a candidacy which do not measure the probability of attracting significant voter support solely by the neutral fact of payment of a filing fee. States may, for example, impose on minor political parties the precondition of demonstrating the existence of some reasonable quantum of voter support by requiring such parties to file petitions for a place on the ballot signed by a percentage of those who voted in a prior election. See American Party of Texas v. White, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (decided March, 1974). Similarly, a candidate who establishes that he cannot pay the filing fee required for a place on the primary ballot may be required to demonstrate the 'seriousness' of his candidacy by persuading a substantial number of voters to sign a petition in his behalf. The point, of course, is that ballot access must be genuinely open to all sub-

ject to reasonable requirements. Jenness v. Fortson, 403 U.S. 431, 439, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971)." 94 S.Ct. at 1321.

Having established this state's right to reasonable regualtion of the ballot, we must decide whether the requirements of § 3–8–24.4, supra, meet the "reasonable quantum" test required by Lubin v. Panish.

■ This court has previously upheld one statute [§ 3–8–2(B)(C), N.M.S.A. 1953] requiring that nominating petitions for minority party candidates be signed by three percent of the qualified electors of the state as computed from the total number of votes cast for the office of Governor at the last preceding general election. People's Constitutional Party v. Evans, supra. The resolution of the case was based in part upon the Supreme Court decision in Jenness v. Fortson, supra, which upheld a nominating petition procedure requiring five percent (5%) of the total of all registered voters in order to get the nominees of a minor political party on the ballot. Many other courts have upheld nominating petition statutes with requirements similar to ours. See Jones v. Hare, 440 F.2d 685 (6th Cir. 1971); People's Party v. Tucker, 347 F.Supp. 1 (M.D.Pa.1972); Baird v. Davoren, 346 F.Supp. 515 (D.Mass.1972); Jackson v. Ogilvie, 325 F.Supp. 864 (N.D. Ill.1971), aff'd 403 U.S. 925, 91 S.Ct. 2247, 29 L.Ed.2d 705 (1971); Beller v. Kirk, 328 F.Supp. 485 (S.D.Fla.1970). Consequently, we hold that § 3–8–24.4, supra, is not repugnant to the equal protection clause of the fourteenth amendment. The percentage requirements are identical for the different political parties. All candidates of the same party running for the same office must acquire the same number of signatures. Any disparity in the number of signatures required as between the different parties merely accentuates the basic fairness of our procedure in recognizing the variation in the number of registered voters affiliated with the numerous parties in this state.

■ We also note that the new law provides a reasonable alternative to the nominating petition procedure in the provisions for counting and canvassing write-in candidates. Section 3–8–24.7, supra. Although seven justices in the Lubin case, supra, cast doubt on whether a write-in·procedure, as the only alternative to filing fees, would be constitutionally firm as an "acceptable alternative", we do not interpret this dictum to mean the write-in procedure is not a constitutionally acceptable alternative to the nominating petition procedures. In fact, we hold that it is.

Dillon's next contention is that passage of the statutes in question occurred after the 60th calendar day of the legislative session in direct violation of N.M.Const. art. 4, § 5 and the new law is consequently void. On the other hand, the defendants assert that House Bill 383 was in all respects properly enacted according to the enrolled and engrossed bill and that, under a long line of decisions by this tribunal, the trial court correctly refused to look behind the enrolled and engrossed bill to determine whether there were any irregularities in its passage.

Art. 4, § 5 provides in part:

"A.  *  *  *  Every regular session of the legislature convening during an odd-numbered year shall remain in session not to exceed sixty [60] days, and every regular session of the legislature convening during an even-numbered year shall remain in session not to exceed thirty [30] days.  *  *  *"

It appears that in 1973, the First Session of the 31st Legislature of New Mexico remained in session past the time limit prescribed by the Constitution, and that the statutes in question were, or may have been, passed after the time specified for adjournment. The court did not in its findings determine the assertions stated in the preceding sentence to be true.

The thrust of the defendants' evidence, as found by the court, was that the 31st Legislature worked hard, but unsuccessfully, to conclude its business within the constitutional time limitation. It recognized that more legislation was passed by the 31st Legislature than any other in New Mexico history and concluded that, if any time violation occurred, it was free of any bad or fraudulent motive.

Certainly the mounting crush of legislation is not in doubt, being evidenced by the ever-thickening volumes of session laws. Since 1960, every legislature convened in odd-numbered years has passed more legislation than any legislature in history. This may well have been the vice the people had in mind in adopting art. 4, § 5, supra.

The trial court had before it the enrolled and engrossed bill, published as Ch. 228 [1973] Laws of N.M. 833, and now compiled as § 3–8–17 to 3–8–26.1, supra. The appellees argue that the enrolled and engrossed bill is conclusive and unimpeachable. Clary v. Denman Drilling Co., 58 N.M. 723, 276 P.2d 499 (1954); Thompson v. Saunders, 52 N.M. 1, 189 P.2d 87 (1947); State ex rel. Clancy v. Hall, State Treasurer, 23 N.M. 422, 168 P. 715 (1917); Smith et al. v. Lucero, Sec'y of State, 23 N.M. 411, 168 P. 709 (1917); Kelley v. Marron, State Treasurer, 21 N.M. 239, 153 P. 262 (1915); Earnest, Trav. Auditor v. Sargent, Auditor, 20 N.M. 427, 150 P. 1018 (1915). The court concluded from this mass of authority that it could not go behind the enrolled and engrossed bill to determine whether or not there were any irregularities in its enactment.

■ Viewed narrowly, we are not called upon to decide the correctness of the court's ruling. Mr. Dillon has failed to challenge the trial court's findings of fact and otherwise preserve the question for review in the manner prescribed by the rules of appellate procedure. These deficiencies require an affirmance of the issue under consideration. Scott v. Homestake-Sapin, 72 N.M. 268, 383 P.2d 239 (1963).

However, we deem it appropriate to record the view of a majority of the court on the issue of law presented. Failure to do so might occasion great mischief should the propriety of the time honored evolution of "stopping the clock" be properly drawn into question.

Our basic premise is that the Constitution is the supreme law and each department of government must comply with it. Through art. 4, § 5, supra, the voice of the people speaks clearly in directing the Legislature to complete its business within the prescribed time and then to go hence from the legislative halls. There is not the slightest doubt that the legislators are duty bound to comply with this constitutional directive. Their frequent failure to do so breeds disrespect for our law and our institutions. Ignoring this constitutional mandate reflects no credit upon the legislative branch of government for having indulged in such a course, or upon the judicial branch for having condoned it. We think the time has come to re-examine the issue.

We will not dwell upon the deference to which each branch of government ought to accord the official acts of the others under our separation of powers clause. N.M.Const. art. 3, § 1. We disclaim any intention of even suggesting to the Legislature how it should conduct its affairs. It is nevertheless our function and duty to say what the law is and what the Constitution means. Cf. United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed. 2d 1039 (1974); Marbury v. Madison, 5 U. S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

Though New Mexico has a series of cases committing us to the enrolled bill rule, we do not think that rule should be applicable when a law is challenged as being passed in violation of that part of N. M.Const. art. 4, § 5 under consideration. Henceforth, on direct attack, a majority of this court would hold that inquiry may be made into the question of whether or not the act or bill purportedly passed by the Legislature within the constitutional time

limitation was in truth and in fact passed within that limitation. If it should appear in a proper suit that a law was passed in contravention of art. 4, § 5, supra, we would hold that the law be declared void upon the ground that the Legislature had ceased to be a legislative body by operation of the Constitution and was, therefore, without jurisdiction or authority to transact business or perform any lawmaking function. See State v. Davis, 123 Fla. 41, 166 So. 289 (1936); State v. Thompson, 121 Fla. 561, 164 So. 192 (1935). The conclusive legal presumption that ordinarily attaches to enrolled bills simply would not attach. The reason was well stated by Justice Davis of the Supreme Court of Florida in the Davis case.

"The test of legislative power is constitutional restriction; * * * *. The Legislature is but an instrumentality appointed by the Constitution of this state to exercise a part of its sovereign prerogatives, namely, the lawmaking power. In that capacity it holds and exercises governmental powers of the highest order. From the commencement of independent government in the United States to the present time the legislative powers of the several states have been vested in their respective Legislatures. But without exception it has been provided in State Constitutions that Legislatures shall be limited as to time in the exercise of their prerogative powers of lawmaking to stated regular or special sessions during which sessions only, said prerogative lawmaking powers can be constitutionally exercised.

"When the Constitution fixes the period of permissible legislative activity, lawmaking sessions can be held at no other times, and for no longer periods of time than the Constitution of state provides." 123 Fla. at 61, 166 So. at 297.

What we have said concerning violation of the time limitations laid down by art. 4, § 5, supra, is prospective only and will apply to sessions of the Legislature

convened in the future. Moreover, we confine our view to the particular constitutional violation under discussion, and do not intend to herald the complete demise of the enrolled bill rule. The cited precedents creating that rule are not overruled other than Earnest, Trav. Auditor v. Sargent, Auditor, supra, which dealt with the precise issue to which we have addressed ourselves. As stated earlier, art. 4, § 5, supra, unquestionably constitutes the time during which the Legislature may exercise its legislative prerogative of enacting laws. Such prerogative comprehends the introduction, consideration and passage of bills and joint resolutions, etc. But this article is not a limitation that operates to restrain the Legislature from complying fully with definitely imposed non-discretionary lawmaking duties. See N.M.Const. art. 4, §§ 17, 20. In this respect the court in Davis, supra, recognized:

> "Unless expressly or impliedly made applicable to the performance of legislative duties that are merely incidental to the proper recording or authentication of legislative acts evidencing a duly completed exercise of lawmaking power, organic limitations specifying a stated number of permissible days for the Legislature to be in session do not restrict absolutely the time of performance of such incidental duties. This is so, because limitations restricting the exercise of lawmaking powers permitted to the legislative department should not in reason be construed to defeat the performance by that department of mandatory incidental duties that are indispensable to be performed in order to effectuate its lawmaking power already exercised in due and proper season." 123 Fla. at 62, 166 So. at 297.

Other points raised by Mr. Dillon are without merit.

The declaratory judgment of the trial court is affirmed.

It is so ordered.

McMANUS, C. J., and OMAN, J., concur.