STATE, *ex rel.* CUNNINGHAM, *et al.*, v. ROBERT W. DAVIS, JR., *et al.*

166 So. 289.
Division A.
Opinion Filed February 25, 1936.

44

H. H. Wells, B. K. Roberts, William K. Whitfield, all of Tallahassee, and Stanton Walker and George A. Pierce, of Jacksonville, for Relators;

Cary D. Landis, Attorney General, H. E. Carter and J. V. Keen, Assistants, and Henry C. Tillman, for Respondents.

STATEMENT.

The Florida Constitution contains the following:

"ARTICLE III.

*Legislative Department*

"Section 1. The legislative authority of this State shall be vested in a Senate and a House of Representatives, which shall be designated, the Legislature of the State of Florida. and the sessions thereof shall be held at the seat of the government of the State.

"Section 2. The regular sessions of the Legislature shall be held biennially, commencing on the first Tuesday after the (first) Monday in April, A. D. 1887, and on the corresponding day of every second year thereafter, but the Governor may convene the same in extra session by his. proclamation. Regular sessions of the Legislature may extend to sixty days, but no special session convened by the Governor shall exceed twenty days.

"Section 6. Each house shall judge of the qualifications, elections and returns of its own members, choose its own officers, and determine the rules of its proceedings. The Senate shall, at the convening of each regular session thereof, choose from among its own members a permanent president of the Senate, who shall be its presiding officer. The House of Representatives shall, at the convening of each regular session thereof, choose from among its own members a permanent Speaker of the House of Representatives, who shall be its presiding officer. Each House may punish its own members for disorderly conduct; and each House, with the concurrence of two-thirds of all its members present, may expel a member.

"Section 12. Each House shall keep a Journal of its own proceedings, which shall be published, and the yeas and nays of the members of either House on any question shall, at the desire of any five members present, be entered on the Journal.

"Section 17. Every bill shall be read by its title on its first reading in either House, unless one-third of the members present desire it read by sections. Every bill shall be read on three several days, unless two-thirds of the members present when such bill may be pending shall deem it expedient to dispense with this rule. Every bill shall be read by its sections on its second reading and on its final passage, unless on its second reading two-thirds of the members present in the House where such bill may be pending shall deem it expedient to dispense with this rule. The vote on the final passage of every bill or joint resolution shall be taken by yeas and nays, to be entered on the Journal of each House; Provided, that any general revision of the entire laws embodied in any bill shall not be required to be read by sections upon its final passage,

and its reading may be wholly dispensed with by a two-thirds vote. A majority of the members present in each House shall be necessary to pass every bill or joint resolution. All bills or joint resolutions so passed shall be signed by the presiding officer of the respective Houses and by the secretary of the Senate and the clerk of the House of Representatives. (Amended Joint Resolution 2, Acts 1895; adopted at general election, 1896.)

"Section 28. Every bill that may have passed the Legislature, shall, before becoming a law, be presented to the Governor; if he approves it he shall sign it, but if not he shall return it with his objections to the House in which it originated, which House shall cause such objections to be entered upon its Journal, and proceed to reconsider it; if, after such reconsideration, it shall pass both Houses by a two-thirds vote of members present, which vote shall be entered on the Journal of each House, it shall become a law: If any bill shall not be returned within five days after it shall have been presented to the Governor, (Sunday excepted) the same shall be a law, in like manner as if he had signed it. If the Legislature, by its final adjournment prevent such action, such bill shall be a law, unless the Governor, within ten days after the adjournment, shall file such bill, with his objections thereto, in the office of the Secretary of State, who shall lay the same before the Legislature at its next session, and if the same shall receive two-thirds of the votes present it shall become a law.

Section 98 (82) Compiled General Laws, 1927, is as follows:

"All bills and joint resolutions passed by the Senate and House of Representatives shall be duly enrolled in black record ink, by typewriting machines, on paper, by the enrolling clerk of the Senate or the enrolling clerk of the

House, accordingly as the bill or joint resolution may have originated in the Senate or House, before they shall be presented to the Governor or filed in the office of the Secretary of State.

"The size, style and quality of the paper to be used shall be prescribed by the Secretary of State and furnished by him, in sufficient quantities, to the enrolling clerk of the Senate and the enrolling clerk of the House."

The alternative writ alleges that Senate Bill No. 724 "was signed by all of the 'legislative' officials subsequent to 9 o'clock A. M. of Saturday, June 1st, A. D. 1935;" and that "the signing of the bill by the officers of the House and Senate and the presentation thereof to the Governor took place after the Florida Legislature for 1935 was *functus officio.*"

The period of the regular session of the Legislature ended by constitutional limitation at midnight, May 31, 1935.

The answer of respondent Secretary of the Senate contains the following:

"This Respondent has no recollection independent of the Senate Journal of May 31, 1935, as to when Senate Bill 724 was signed by the President and Secretary of the Senate and referred to the Joint Committee on Enrolled Bills on the part of the Senate to be conveyed to the Governor for his approval, and as to the time when said Senate Bill 724 was presented to the Governor for his approval, and is without knowledge as to when those things were done other than what is shown by the Senate Journal for May 31, 1935, and having no recollection independent of said Senate Journal as to when said Senate Bill 724 was signed by the President and Secretary of the Senate and presented to the Governor for his approval, this Respondent cannot admit that said Senate Bill 724 was signed by the

President and Secretary of the Senate and presented to the Governor for his approval, other than as is shown by the Senate Journal for May 31, A. D. 1935. This Respondent says that said Senate Bill 724 was signed by this Respondent and the President of the Senate, while the Senate was in session, and presented to the Governor, all before final adjournment of the 1935 session of the Legislature. This Respondent, however, shows unto the Court that all proceedings of the Senate and the Acts of its officers, committees and employees are shown in the Senate Journal as of May 31, A. D. 1935, by order of and at the direction of the Senate, prior to midnight, May 31, 1935."

"This Respondent shows unto the Court that he did not carelessly, mistakenly, or incorrectly permit the Senate Journal of May 31, 1935, to show that Senate Bill 724 was 'duly signed by the President and Secretary of the Senate in open session and ordered referred to the Joint Committee on Enrolled Bills on the part of the Senate to be conveyed to the Governor for his approval,' but that the same was shown as it appears at the direction and by order of the Senate in session prior to adjournment of the Session of 1935."

The answer of the respondent Clerk of the House of Representatives contains the following:

"This respondent admits that the enrolled Senate Bill No. 724, known as Chapter 16848, Acts of 1935, was signed by this Respondent as Chief Clerk of the House of Representatives, and by the Speaker of the House of Representatives, during the forenoon of June 1, A. D. 1935, but says that the said Senate Bill No. 724 was so signed by this Respondent and the Speaker of the House of Representatives while the House was in session and before final adjournment of the 1935 session of the Legislature. This

Respondent, however, shows unto the Court that all proceedings of the House of Representatives and the acts of its officers, committees, and employees, are shown in the House Journal as of May 31, A. D. 1935, by order and at the direction of the House of Representatives prior to midnight, May 31, 1935."

"This Respondent shows unto the Court that he did not carelessly, mistakenly or incorrectly, permit the House Journal of May 31, 1935, to show that Senate Bill 724 was 'duly signed by the Speaker and Chief Clerk of the House of Representatives in open session, and ordered referred to the chairman of the Committee on Enrolled Bills on the part of the House of Representatives to be conveyed to the Senate for the signatures of the President and Secretary thereof' but that the same was shown as it appears at the direction and by order of the House of Representatives while in session prior to adjournment of the Session of 1935."

The relators filed the following:

### "MOTION FOR PEREMPTORY WRIT

"Come now the Relators herein * * * and without waiving the benefit of Demurrer and Motion to Strike heretofore filed herein, moves this Honorable Court to grant and issue Peremptory Writ in due and proper form, directed to the Respondents, Robert W. Davis, Jr., as Secretary of Senate, State of Florida, 1935 Session of the Legislature, and Weldon G. Starry, as Chief Clerk of the House of Representatives, State of Florida, 1935 Session of the Legislature, and R. A. Gray, as Secretary of State of the State of Florida, because of insufficient return in law to the Alternative Writ, and because of the admission of the Respondent Starry, in his answer and return, that said Senate

Bill 724 was not signed by himself and the Speaker of the House of Representatives prior to June 1st, 1935."

Davis, J.—Senate Bill No. 724 (now Chapter 16848, Acts of 1935, General Laws of Florida, is in controversy in this proceeding the complainant being (as set forth in the alternative writ of mandamus issued herein) that although the said bill duly "passed" the Senate and the House of Representatives on or before the legislative calendar day of May 31, 1935, that said bill was not, as required by Section 17 and 28 of Article III of the Constitution of Florida "signed by the presiding officers of the respective Houses and by the secretary of the Senate and the clerk of the House of Representatives" nor "presented to the Governor" until on or after the calendar day of June 1, 1935.

A motion to quash the alternative writ of mandamus has been heretofore overruled (but without opinion) on the authority of State, *ex rel.* Landis v. Thompson, 121 Fla. 561, 164 Sou. Rep. 192, decided November 14, 1935. By a return filed by the respondent ministerial officers of the Legislature the fact is admitted that the regular 1935 session of the Florida Legislature did not in fact adjourn *sine die* on the calendar day of May 31, 1935, as set forth on the face of its purported legislative journals of that day's session; that on the contrary it continued its actual sitting as a legislative assembly much beyond that calendar day, indeed, into the calendar day of June 1, 1935, and afterward; that although all legislative action on said Senate Bill No. 724, up till and including its final passage as a legislative Act, occurred in the Legislature, on or before the calendar day of May 31, 1935, that nevertheless the Legislature's enrollment of the bill as a "passed" bill, its formal authentication by the attaching to it of the signature of the presiding officers of the Senate and of the House of

Representatives, the attestation of the Secretary of the Senate and of the Clerk of the House of Representatives and the actual presentation by the Legislature of the enrolled bill to the Governor for his consideration and approval, in purported compliance with Sections 17 and 28 of Article III of the State Constitution, did not in truth and in fact transpire or occur until on or after the calendar day of June 1, 1935.

So the proposition of constitutional law now required to be decided on the pleadings in this case is: "Did the 1935 regular session of the Florida Legislature, whose constitutional authority to legislate and ordinarily function as a law-making body admittedly expired at midnight on May 31, 1935, according to Section 2 of Article III of the Florida Constitution, nevertheless, by virtue of the intendments of Sections 12, 17 and 28 of the same Article possess implied constitutional authority to remain undissolved as a legislative assembly until June 1, 1935, and afterward, in order to carry out its constitutional duty to make a proper journal of its proceedings already lawfully had during its sixty days term of existence, as well as to formally authenticate and present to the Governor all bills it had constitutionally passed during its regular session?" In other words, did the 1935 regular session of the Legislature retain authority to continue to sit unadjourned *sine die* on and after June 1, 1935, for a sufficient period of time to complete and approve, *nunc pro tunc* as of May 31, 1935, the journals of its regular legislative proceedings that required completion and approval, as well as to have its officers enroll, sign and cause to be presented to the Governor in constitutional form, any unauthenticated legislative Acts it may have constitutionally "passed" during its regular sixty days of legislative session?

. In State, *ex rel.* Landis, v. Thompson, 164 Sou. Rep.

192, *supra,* we definitely held that, on direct attack, this Court can inquire into whether the Legislature has attempted to exceed its jurisdiction as a Legislature by remaining in unadjourned session beyond its allotted constitutional number of days. And to that end this Court held that it would entertain appropriate judicial proceedings to determine whether that which purports to be a record of legislative action taken during a regular constitutional session of the Legislature, is, in truth and in fact, a record duly made by the Legislature under such circumstances as to import to it a conclusive verity as such record, or is some other sort of record not entitled to be judicially noticed as conclusive record evidence within the range of our judicial knowledge when brought to the Court's attention.

We now reaffirm what was held in that case. And in so holding, we now proceed to the subordinate inquiry whether or not the particular relief in this case should be awarded in view of the showing made and admitted to be true on the face of the pleadings herein which establishes the fact that no law-making action with reference to Senate Bill No. 724 was taken after May 31, 1935, by the 1935 regular session of the Legislature save and except to have the bill as already passed on or before May 31, 1935, duly enrolled and signed on Saturday, June 1, 1935, by the legislative officers in the presence of the Legislature which still remained in actual session on that date for that purpose, as well as for the purpose of duly presenting (before it actually dissolved as a Legislature) the enrolled and authenticated bill to the Governor of the State for his approval or rejection in the manner contemplated by the constitutional provisions on the subject, to which we have heretofore made reference.

To decide this question we first consider and discuss what

was heretofore held by this Court in the cases of Amos v. Gunn, 84 Fla. 285, 94 Sou. Rep. 615, and State, *ex rel.* Landis, v. Thompson, 121 Fla. 561, 164 Sou. Rep. 192.

In neither of the cited cases was any question of interpretation of the precise limitations imposed by Section 2 of Article III of the Constitution involved. The whole scope of inquiry in the Amos v. Gunn case was whether or not a legislative bill once duly passed by the Legislature during its allotted constitutional term of sixty days of lawmaking session was required by Sections 17 and 28 of Article III of the Constitution to be subsequently enrolled and, signed by the legislative officers and presented to the Governor for his approval or rejection, *while the Legislature, was still in undissolved session.*

And in that proceeding this Court originally (and on rehearing) in perhaps the most able and exhaustive series of opinions ever written by Justices of this Court on a controverted proposition of constitutional legislative procedure, reviewed the authorities pro and con on the proposition whether or not a legislative bill duly passed by the Legislature in constitutional session is likewise required to be enrolled and authenticated by the legislative officers and by the Legislature presented to the Governor while the Legislature still sits as a legislative body for the performance of the act of authentication and presentation to the Governor in accordance with the commands of the Constitution.

In deciding that case, this Court (on rehearing) adopted the opinion of Mr. Justice ELLIS to the effect that:

"1st. The provision contained in Section 17, Article, III, of the Constitution requiring the presiding officers and, the clerks of each House of the Legislature to sign all bills and joint resolutions passed is mandatory.

"2nd. That such signing of bills and joint resolutions must be done in open session of the House over which the officer signing is then presiding and to which the clerk · signing is attached.

"3rd. That no bill passed by the Legislature can become a law until it has been presented by the Legislature to the Governor.

"4th. That such presentation can be made by the Legislature only while in session.

"5th. That the enrolled bill on file with the Secretary of State showing upon its face to have been signed by the presiding officers of the two Houses and their respective clerks before the Legislature adjourned and to have been approved by the Governor is *prima facie* evidence that all mandatory provisions of the Constitution as to the requirements to be observed by the Legislature in the passage of the bill, signing by the officers and presentation to the Governor, have been complied with.

"6th. That such *prima facie* evidence may be overcome by reference to the journals of either house, which, if they affirmatively show such mandatory provisions were not complied with, the so called Act of the Legislature must fail.

"7th. That the approval by the Governor of a bill which has passed the Legislature, is a certification by him that the bill after its passage was presented to him while the Legislature was in session.

"8th. That the Governor's approval of a bill passed by the Legislature constitutes an executive record which imparts the same verity, is as solemn and dignified an act and entitled to the same faith, credit and respect as the records of a court or those of the Legislature.

"9th. That the silence of the journals of the Legislature upon the question of whether the bill passed by the

Legislature was signed by the presiding officers of the two Houses and their clerks does not overcome the *prima facie* evidence of regularity afforded by the enrolled bill on file with the Secretary of State, bearing upon its face the approval of the Governor and the signatures of the presiding officers of the two Houses of the Leigslature appearing to have been attached before the Legislature adjourned."

To that opinion we still adhere and so holding, we here and now approve and reaffirm the principles of law that were therein set forth in the opinion of Mr. Justice ELLIS as the views of a majority of this Court in the premises.

This brings us to the proposition whether or not the provisions of Section 2 of Article III confining the duration of a regular session of the Legislature to not exceeding sixty (consecutive) days, operates also as a constitutional limitation on the authority of the Legislature to formally sit unadjourned *sine die* for the purpose of authenticating and presenting to the Governor for his consideration and approval "bills" that may have been regularly passed during its sixty constitutional days of law-making session but the authentication and presentation of which to the Governor in accordance with Sections 17 and 28 of Article III of the Constitution it was not able to completely accomplish during the period of days comprehended within the limitation prescribed by Section 2 of Article III for the duration of its regular session.

The foregoing proposition is not concluded by anything that has been heretofore decided either in the case of Amos v. Gunn, *supra,* or in the case of State, *ex rel.* Landis, v. Thompson, *supra.*

In the Amos v. Gunn case the allegations of the pleadings showed that the legislative bill involved had been regularly passed during the sixty day regular session of the

1921 Legislature. But it was further alleged without any matter of record being referred to in support of such allegation that due to some inadvertence in its handling thereafter, it was never enrolled, nor signed by the presiding officers and clerks of the two Houses in the presence of the Legislature before it actually dissolved, nor by the Legislature itself presented to the Governor for his approval. In consequence of such stated omission, it was contended that the bill was never constitutionally authenticated in the manner contemplated by the Constitution, nor properly presented to the Governor. By reason of such defaults it was thereupon asserted that the bill was undeniably void.

This Court, conceding that the bill would be unconstitutional if not signed by the presiding officers and by the clerks of the two Houses of the Legislature in the presence of the Legislature and by the Legislature presented to the Governor while the Legislature was still undissolved, nevertheless refused to strike the bill down, because of the showing that the bill was there being attacked collaterally in an injunction proceeding wherein the officials accused of the alleged acts of misconduct were not made parties, and further because of the conclusive presumption of proper authentication and presentation of the bill to the Governor that attached to the Governor's signature to the enrolled bill when he signed it and placed it on file in the Secretary of State's office.

In the State, *ex rel.* Landis, v. Thompson case the principal holding was that in a direct, not collateral proceeding, this Court would require to be judicially corrected any putative legislative record within the range of judicial knowledge if on its face it appeared to have been made within constitutional authority during an authorized legis-

lative session, but was in truth and in fact not a genuine legislative record that it purported to be.

The rationale of that decision was that if the Legislature has no constitutional power to further legislate, or to further act as such with regard to any legislative proposition after its constitutional term of sixty days has run out, that then, by the same token, no mere record it may make of its non-constitutional sitting as a Legislature after it becomes *functus officio* can rise to any greater evidentiary dignity in the consideration of the courts than the unconstitutional sitting itself could rise. Accordingly it was held that since the courts are bound under the law to take judicial notice of legislative records, but notice only of constitutionally made records of the Legislature, as importing absolute verity in their contents, they are necessarily invested with inherent power to use their appropriate judicial processes to expunge from the range of their judicial observation in an appropriate case any purported legislative journal entries that were not made in contemplation of law as a record of what the Legislature did during a constitutionally authorized sitting as a legislative assembly.

So until the present case, no controversy has arisen, nor has any controversy been decided by this Court, involving the implied power of the Legislature to, in effect, "hold over" not under the direct authority of Section 2 of Article III of the Constitution, but under the implied authority of Sections 12, 17 and 28 of Article III aforesaid, for the purpose of executing its mandatory duty to carry out that which the organic law in those sections requires to be made of record and put in due form as a duly approved authentication of all legislative acts that have been properly passed within the limitations of Section 2 of said Article III and other sections and articles of the Constitution.

Section 2 of Article III of the Constitution as construed and applied in our recent opinion in the case of State, *ex rel.* Landis, v. Thompson, 164 Sou. Rep. 192, *supra*, undoubtedly operated as a definite limitation on the authority of the 1935 regular session of the Legislature to remain in session for the purpose of *transacting* any legislative business or performing any law-making function, whatever its character after midnight on the day of May 31, 1935. This is so, because at that time the 1935 Legislature became *functus officio* as a law-making body and was no longer entitled under the Constitution to originate, consider, agree to, or vote upon any "bill" or resolution which at that time remained in the status of a mere legislative proposal.

But it does not follow from the rationale of that decision nor from anything implied in its holding, that the "days of session" limitations of Section 2 of Article III of the Constitution are to be construed and applied so as to defeat the Legislature's performance of its mandatory duties under Sections 12, 17 and 28 of the same article to properly authenticate and make a record of all "bills" it may have already completely "passed" during the sixty days' term of its constitutional existence as a law-making body.

Sections 17 and 28 of Article III of the Constitution, as was held in Amos v. Gunn, 84 Fla. 295, 94 Sou. Rep. 615, *supra,* clearly contemplate that the specific duties imposed by such sections on the Legislature as such, shall be performed while the Legislature is still in actual session and undissolved as a legislative body. Indeed, it was definitely so held by a majority of this Court on the rehearing granted and had in that case. But there is nothing in that opinion nor is there anything contained in any other opinion of this Court, which implies that the Legislature's obedience to Sections 17 and 28, or with Section 12 of said Article

III of the Constitution, must be fully accomplished during the sixty days of lawmaking session authorized by Section 2 of Article III of the Constitution, so long as such compliance is had while the Legislature remains in actual session and undissolved as a parliamentary body for the purpose of fully completing the constitutional duties specifically imposed upon it to make a proper record of what it may have constitutionally done, as well as to constitutionally authenticate and thereupon present to the Governor all bills that it may have already constitutionally passed before its ordinary powers as a lawmaking body became *functus officio* under Section 2 of Article III at the end of the limited sixty days therein specified.

The constitutional duty of enrolling and signing a bill and thereupon presenting it to the Governor for his approval, is a duty that in the nature of things can only be carried out by the Legislature *after* such bill has been completely passed. Prior to final passage of a legislative bill no enrollment nor authentication of it as contemplated by Section 17 of Article III of the Constitution can be had. Nor can it be presented by the Legislature to the Governor in accordance with Section 28 of the same Article, because only a bill that has been duly "passed" and "signed by the presiding officers," etc., of the Legislature after passage is authorized to be by the Governor received for his consideration. Thus, as it was stated in Amos v. Gunn, *supra,* "The Governor has no power to approve a document as a bill which has passed the Legislature unless it has been presented to him by that body with the signatures thereon of the presiding officers and clerks of the two Houses * * *" (84 Fla. text 344).

By the same course of reasoning, the Legislature has no constitutional authority to have a bill presented to the Gov-

ernor with the signatures thereon of the presiding officers and clerks of the two Houses, until after it has first been completely and irrevocably passed by it. Hence every legislative compliance with the constitutional requirement of authentication and presentation of bills "passed" is an act. that, in its very essence, is nothing more than the making *nunc pro tunc* as of the date of passage, a proper constitutional record of that which has already been completely disposed of *in limine* by the legislative will. The performance of such acts is therefore not the exercise of any legislative prerogative that can be accomplished only during the sixty days limited by Section 2 of Article III, but is the simple performance of an implicit constitutional duty that devolves upon the Legislature at all events by reason of its already exerted legislative prerogative whenever it has been lawfully exercised in the form of an affirmative vote passing the bill while the Legislature is in ordinary lawmaking session for the purpose.

Section 2 of Article III of the Constitution is unquestionably a constitutional limitation upon the time a regular session of the Legislature once convened, may continue in actual session thereafter as a lawmaking body for the purpose of exercising its legislative prerogative of enacting laws. Such legislative prerogatives comprehend the introduction, consideration, and passage of bills and joint resolutions, the appointment of committees and the consideration and disposition of the reports thereof relating thereto prior to the final passage, etc. But said Section 2 of Article III of the Constitution is not by any means a limitation that operates to restrain the Legislature from accomplishing full compliance with definitely imposed non discretionary legislative duties, as distinguished from the exercise of its prerogative lawmaking powers, even though

"holding over" unadjourned *sine die* may be required for that purpose beyond the specified number of days allotted by Section 2 of Article III of the Constitution for the exercise of lawmaking prerogatives.

The requirement imposed by Sections 12, 17 and 28 of Article III of the Constitution with reference to the keeping of proper legislative journals covering the last days of a session of the Legislature, as well as the earlier days, the requirement of seeing to it that all bills passed by it during its allotted sixty days are subsequently signed in open session in the presence of the two Houses, and thereafter, by the Legislature through its appropriate agencies constituted for that purpose (as distinguished from its mere officials acting on their own initiative) presented to the Governor for his approval, are not lawmaking prerogatives, but are non discretionary mandatory legislative duties which the Legislature not only has the power and authority to perform before it actually dissolves *sine die* as a Legislature sitting in regular constitutional session, but are duties which, under the Constitution, the Senate and House of Representatives are bound to fully carry out before they are constitutionally warranted in actually adjourning *sine die* thereby bringing about their irrevocable dissolution as a legislative body. The fact that the individual legislators may in practice defeat their own legislative acts by their unconstitutional neglect to fully perform such duties before they actually disperse as a Legislature adjourned *sine die,* is no ground for holding that the duties themselves never existed.

The test of legislative power is constitutional restriction; what the people have not said in their organic law their representatives shall not do, they may do. Woodson v. Murdock, 22 Wall. 351, 22 L. Ed. 716. The Legislature is

but an instrumentality appointed by the Constitution of this State to exercise a part of its sovereign prerogatives namely, the lawmaking power. In that capacity it holds and exercises governmental powers of the highest order. From the commencement of independent government in the United States to the present time the legislative powers of the several states have been vested in their respective legislatures. But without exception it has been provided in state constitutions that Legislatures shall be limited as to time in the exercise of their *prerogative* powers of lawmaking to stated regular or special sessions during which sessions only, said prerogative lawmaking powers can be constitutionally exercised.

When the Constitution fixes the period of permissible legislative activity, lawmaking sessions can be held at no other times, and for no longer periods of time than the Constitution of State provides. But the limitations so placed by the Constitution upon the right of a Legislature to convene and sit as a parliamentary body for the exercise of its normal lawmaking legislative functions, have reference to a restriction on the exercise of prerogative lawmaking powers only, not on the carrying out of inescapable constitutional duties that may have arisen solely as an incident to a lawmaking power already duly exercised *in limine.*

Unless expressly or impliedly made applicable to the performance of legislative duties that are merely incidental to the proper recording or authentication of legislative acts evidencing a duly completed exercise of lawmaking power, organic limitations specifying a stated number of permissible days for the Legislature to be in session do not restrict absolutely the time of performance of such incidental duties. This is so, because limitations restricting the exercise of lawmaking powers permitted to the legislative de-

partment should not in reason be construed to defeat the performance by that department of mandatory incidental duties that are indispensable to be performed in order to effectuate its lawmaking power already exercised in due and proper reason.

In the present proceeding it is established by the legislative journals and by the allegations of the return filed to the alternative writ of mandamus, that the Legislature of 1935 had fully exercised all of its lawmaking privileges and powers with reference to the final passage of Senate Bill No. 724 at the time the Legislature became *functus officio* as to its lawmaking powers at midnight on May 31, 1935. All that is shown by the pleadings to have been done by the Legislature after that time, so far as Senate Bill No. 724 was concerned, was that it remained together on June 1, 1935, in a "hold over" assembly declining to effectuate its own dissolution by *sine die* adjournment until it had first fully complied with Sections 17 and 28 of Article III of the Constitution by enrolling and authenticating said Senate Bill No. 724 that it had already constitutionally passed in an acknowledged proper "exercise" of its prerogative lawmaking power to enact it as a law during the sixty days' period prescribed by Section 2 of Article III as the permissible "regular session" for such an enactment.

Implied powers of the Legislature are as potent as expressly conferred powers. The express declaration of the power of the Legislature to cause any regular session to "extend to sixty days" in accordance with Section 2 of Article III of the Constitution, *ex necessitate* implies its right to exercise its prerogative lawmaking functions as a Legislature up until the very moment of its constitutional prorogation. This in turn implies that under Sections 12, 17 and 28 of Article III of the Constitution the 1935 Legislature was en-

titled to remain in session on June 1, 1935, undissolved as a parliamentary body adjourned *sine die* when it found such holding over and continuation of its sittings to be indispensable to enable it to comply with the express commands of Sections 12, 17 and 28 of Article III as to Acts it had already constitutionally passed but which had not been duly authenticated as such and presented to the Governor, during the sixty days period prescribed by Section 2 of Article III.

We hold, therefore, that insofar as the 1935 Legislature actually held over in unadjourned sitting on June 1, 1935, or after that date for the sole purpose of fully complying with Sections 12, 17 and 28 of Article III of the Constitution as to acts of legislation already duly passed within the regular session period limited by Section 2 of said Article III, that it was constitutionally in unadjourned session for the limited and special purposes aforesaid, notwithstanding the limitations of Section 2 of Article III of the Constitution and that it continued invested with all necessary authority as a Legislature to fully accomplish compliance with the express commands of Sections 12, 17 and 28 of said Article III as to its journals and enrollment, signing and presentation to the Governor of the bill that it had constitutionally passed prior to June 1, 1935, before it undertook to disperse as a parliamentary body adjourned *sine die*.

This we hold not only for the reasons hereinbefore set forth, but for the further reason that once the Legislature becomes *functus officio* as to its lawmaking power under Section 2 of Article III of the Constitution and thereupon actually disperses as a legislative body adjourned *sine die*, it then possesses no power to reassemble as a Legislature in any sort of session, although it still is the duly consti-

tuted Legislature of the State of Florida, and is, as such, subject to being recalled into extra session by the Governor.

The final act of enrollment, the authentication of Senate Bill No. 724, by the signing of it in the presence of each House by the presiding officers and clerks thereof, and its final presentation to the Governor by the Legislature, although each of such steps actually transpired on the calendar day of June 1, 1935, must, in contemplation of the Constitution relate back to the time final lawmaking action on the bill was definitely and irrevocably completed on or before May 31, 1935, the last day of the regular legislative session. Therefore such steps were properly made to appear of record *nunc pro tunc* on the official legislative journals evidencing the legislative proceedings of May 31, 1935. This is so, because that which was finally completed under constitutional authority on June 1, 1935 (as we have herein held was the case) is merely a continuation and subsequent carrying out of constitutional duties that arose, and were inescapably required to be performed as a result of what had already transpired as an exercise of lawmaking power that occurred on or before May 31, 1935. The record of the performance of such duties was therefore constitutionally incorporated into the record of the Legislature's May 31, 1935, legislative day's business and is not subject to the particular attack leveled against it in this proceeding.

To restate the proposition in simile: The death of the 1935 regular session of the Legislature by constitutional limitation at midnight on May 31, 1935, did not defeat performance of its constitutional duty under Section 12, 17 and 28 of Article III of the Constitution to make an orderly disposition of its remains by properly winding up its affairs as soon as practicable thereafter, so long as the as-

sembly did not actually disperse as a parliamentary body and thereby put it beyond its power to reassemble for that purpose absent the call of the Governor into extra session.

The return of the respondents is adjudged sufficient so the alternative writ of mandamus must now be quashed. State, ex rel. Gillespie, v. Carlton, 103 Fla. 810, 138 Sou. Rep. 612; State v Seaboard Air Line R. Co., 92 Fla. 61, 109 Sou. Rep. 656.

Peremptory writ denied and alternative writ of mandamus quashed.

WHITFIELD, C. J., and TERRELL and BUFORD, J. J., concur. ELLIS, P. J., and BROWN, J., dissent.

WHITFIELD, C. J. (concurring).—It is not contended here that Senate Bill No. 724, published as Chapter 16843, Laws of 1935, was not duly passed by each house of the Legislature. See State, ex rel. X-Cel Stores, Inc., v. Lee, filed January 14, 1936. The contention is that the bill was not signed by the legislative officers and presented to the Governor within the time required by the Constitution, which provides that:

"All bills * * * so passed shall be signed by the presiding officer of the respective Houses and by the Secretary of the Senate and the Clerk of the House of Representatives." Sec. 17, Art. III, as amended.

"Every bill that may have passed the Legislature shall, before becoming a law, be presented to the Governor" for his approval or disapproval. Sec. 28, Art. III.

The Constitution does not provide that bills passed by the Legislature shall be signed by the legislative officers and presented to the Governor within the limits of sixty days to which a regular session of the Legislature "may extend" under Section 2 of Article III. Nor does the Constitution require the signing of bills passed by the Legislature or the

presentation of such bills to the Governor, to be stated in the legislative journals of proceedings which each House "shall keep" by command of Section 12, Article III.          :

The terms of office of the members of the Legislature do' not expire at the end of the biennial regular sessions of the Legislature which are required to commence "on the first Tuesday after the first Monday in April, A. D. 1887, and on the corresponding day of every second year thereafter," and "may extend to sixty days." Sec. 2, Art. III.' The sixtieth day of the 1935 regular session expired at midnight on May 31, 1935. The terms of Senators and' members of the House of Representatives expire at the' election of their successors in November of the years when general elections are held.

The answers of the ministerial officers of the Legislature, as shown by the statement preceding the main opinion, aver that the bill here considered was signed by the legislative officers and presented to the Governor while the Legislature was in session; and the court holds that such signing and presentation, as done, comply with the commands of Sections 17 and 28 of Article III of the Constitution and do not violate Section 2 of Article III of the Constitution, even though such signing and presentation were done after the' expiration of the sixty days limited by Section 2, Article III, for the regular legislative session, when done before the members of the Legislature dispersed after the expiration of the sixty days.

The signing by the legislative officers and the presentation to the Governor of bills that have been duly passed by' the Legislature, are not discretionary lawmaking functions, but such signing and presentation are non-discretionary functions that are mandatorily required to be done *after* the bills shall have been duly passed by both Houses of

the Legislature; and bills may be duly passed up to the expiration of the last minute of the sixtieth day of a regular session of the Legislature; therefore to make effective the express organic commands that "all bills * * * so passed shall be signed by the presiding officer of the respective Houses," etc., and that "every bill that may have passed the Legislature shall, before becoming a law, be presented to the Governor," the necessary intendments of such organic commands are that bills which may be passed by the Legislature towards the end of the sixty day period of a regular session shall be duly signed and presented to the Governor as commanded after the due passage of the bills, even if the passage of the bills was so near the end of the period of a session that such signing of duly passed bills by the legislative officers and the presentation of the signed bills to the Governor could not be done till after the expiration of the last day of the session. Of course the quoted organic commands intend that the prescribed mandatory duties shall be performed under direction of the legislative body within a reasonable time and in due course of appropriate procedure.

Each House is expressly commanded to "determine the rules of its proceedings." Section 6, Article III. This express power is intended to enable the Legislature to effectuate its *lawmaking* powers and also to perform the organic commands as to the signing and presentation to the Governor of "every bill that may have passed the Legislature, including bills passed during the last hour of, but before the expiration of, a session, as limited by Section 2 of Article III, even though, because the bills were passed so near the end of the period of the session, the commanded *signing* and *presentation* cannot be done until after the expiration of the last day of the session limitations.

In effect the holding in this case is that at and after the hour of midnight on the sixtieth day of a regular session of the Legislature, the Constitution, in providing that a regular session "may extend to sixty days," necessarily forbids any *lawmaking function* to be performed by the Legislature after the end of the sixtieth day, unless an extra session is duly called. But members of the Legislature and the legislative officers may, at and after the hour of twelve o'clock P. M. of such sixtieth day, proceed in due course to have all bills and resolutions "that may have passed the Legislature" before the expiration of the sixtieth day of the session, and when such duly passed bills have not been signed by the legislative officers and presented to the Governor before the end of the sixtieth day of the regular session, duly signed by the legislative officers and presented to the Governor before the members disperse from their duties. Such signing and presentation, though commanded by the Constitution, are not lawmaking functions, but are the prescribed method of authenticating the identity of the matter contained in the enrolled bills presented to the Governor as being the same as the engrossed bills that "passed the Legislature." The enrolled bills signed by the legislative officers and signed by the Governor, as well as the engrossed bills that "passed the Legislature" are filed and kept in the office of the Secretary of State. Section 98 (82), 116 (94) C. G. L. Bills duly presented to the Governor may be acted on by him after the final adjournment of the Legislature within the limitations prescribed by Section 28, Article III, Constitution.

TERRELL, BUFORD and DAVIS, J. J., concur.

ELLIS, P. J. (dissenting).—I am unable to agree with the opinion and decision of the majority in this case because I think that, according to the allegations of the alternative

writ and averments of the return the relators are entitled to a peremptory writ; that the relators have such an interest in the proceedings as to entitle them to question the legality of the enactment of Senate Bill No. 724 (which is claimed by the Attorney General's office to have been duly enacted at the regular session of the Legislature of the session of 1935 and numbered as Chapter 16848, Laws of Florida) and in pursuance of that end may in such proceedings as are here instituted require Honorable R. W. Davis, Jr., who was Secretary of the Senate, and Honorable Weldon G. Starry, who was Chief Clerk of the House of Representatives of the Regular Session of the Legislature of 1935, to correct and revise the respective Journals of the Senate and House of Representatives for the last three days of the legislative session, to the end that the said Journals as finally incorporated into the bound volumes "may present a truthful and accurate account of the proceedings of the two Houses" pursuant to the requirements of "House Concurrent Resolution No. 30 of the 1935 Session of the Florida Legislature."

That by such proceedings as here instituted, that is to say, by direct attack, relators may establish the fact that the document which purports to be the record of legislative proceedings is not in truth and in fact a true account of such proceedings; that the records in the office of the Secretary of State purporting to be authentic legislative records of the last three days of the regular session of the 1935 Legislature are not in truth and fact a record of the last days of the regular session before it became *"functus officio,"* and that certain entries in the purported journals of the last three days of the regular session relating to Senate Bill No. 724 were false in that the acts and transactions therein recited to have occurred on May 31, 1935, did not

occur upon that day, but did occur upon the following day when the regular session had ceased to exist and be a "legislative body by operation of the Constitution." See State, *ex rel.* Landis, v. Thompson, 121 Fla. 561, 164 South. Rep. 192.

The allegations of the alternative writ are such in relation to certain pretended acts and transactions of the regular session of the Legislature that being established show that the certain constitutional duties required to be performed by the Legislature in regular session in the matter of the attempted enactment of Senate Bill No. 724, Chapter 16848, were not in truth performed by that body while in regular session, or during the period of time fixed by the Constitution for regular sessions, but were attempted to be done by an assemblage of persons in the State Capitol who may have been legislators, but after the constitutional period of time fixed by the organic law for regular sessions of the Legislature and after the Legislature as a lawmaking body had become dormant or *functus officio;* that such facts as alleged in the alternative writ being established, Senate Bill No. 724, Chapter 16848, did not become effective as a constitutionally enacted statute.

I think the "answers and returns" of the respondents, Robert W. Davis, Jr., and Weldon G. Starry, are insufficient and in substance are admissions of the allegations of the alternative writ; that the relators upon the face of the proceedings in this case are clearly entitled to the peremptory writ under the doctrine announced in the case hereinbefore cited, State, *ex rel.* Landis, v. Thompson.

This brings me, therefore, to the consideration of the question whether members of the Legislature may after the full sixty days have expired during which the Constitution empowers them to be in regular session by merely remaining

in the Capitol perform certain constitutional duties in the matter of exercising the power and performing the acts necessary to the production of a statute, the bringing into existence of a legislative enactment.

I think that proposition cannot be logically supported nor can any such theory be supported under a Constitution such as ours.

The opinion of the majority, prepared by Mr. Justice DAVIS, presents, in his usual vigorous and facile way, possibly the best reason for upholding such a proposition that could be found in the books, if any such attempt may be found among them, but I am unable to agree with his reasoning and am impelled to place my views of record.

The term, " 'rump' session of the Legislature," used in the able concurring opinion of Mr. Justice DAVIS in the case of State, *ex rel.* Landis, v. Thompson, 121 Fla. 561, 164 South. Rep. 192, to distinguish an assemblage of persons in the Capitol building, who, as members of the legislative branch of the government, assembled there after the expiration of the time designated and fixed by the Constitution during which as members of the legislative branch of the government they were authorized and empowered to be in session for the transaction of legislative business, from the duly organized constitutional session of the legislative branch, is, in my judgment, an unfortunate use of words tending to produce confusion of thought.

It is so because the term is unknown in the science of American government; inconsistent with its institutions, foreign in origin, and a political impossibility under our Constitution. The term is confusing also because, while it impliedly condemns the assemblage as constitutionally without power to transact any legislative business, it yet

retains by remote intimation the suggestion of some elements existing in a constitutional legislative session.

The term "Rump Parliament" was one applied to a remnant of a Parliament which assembled in the year 1648 in London, England, during the reign of Charles I. It had made certain concessions to the King which offended the army. The armed body interfered, expelled about ninety-six Presbyterian members, leaving about fifty or sixty which were afterwards known as the "Rump." That illegal and unconstitutional body committed the abhorrent crime of regicide, which ever afterwards was condemned as an ineradicable blot upon the history of England, and then proceeded to set up a new government called the commonwealth. It but followed the tendency usually observed in all illegal or unconstitutional assemblages parading in the name of sovereign power.

There is no place, therefore, in my thought, for the term "session of the Legislature," however qualified by adjective or phrase, as applied to any assemblage of men and women members of the legislative branch of the government held outside of the period of time definitely fixed by the Constitution for the exercise by them of the sovereign power of legislation and all matters pertaining to legislative functions. Nor does such an assemblage of legislators recognize the applicability of such term to such an assemblage, for it is commonly known and reported that as the hour of the constitutional session approaches for its constitutional dissolution some members resort to the puerile expedient of stopping the clocks placed in their respective halls in simulation of an arrest of time, as if to anoint by this fanciful procedure the consciences of some of their fellows who know that no authority exists under the Constitution for a prolongation of their legal session beyond the constitutional

period of sixty calendar days to which their regular sessions may extend.    Sec. 2, Art. III, Const.

The conclusion of the majority that the constitutional termination of the legislative session at midnight on May 31, 1935, did not preclude an assemblage of the members of the Legislature the following day and other days indefinitely in order to prepare a journal of its proceedings, cause all bills passed to be signed by the presiding officer of the respective House and Secretary of the Senate and Clerk of the House of Representatives and to be presented to the Governor, rests upon several hypotheses, none of which is supported by any historical or judicial reference and all depend upon the assumption that the exertion of the legislative power consists only in submitting a proposition or bill, discussing its merits and voting upon its passage; that keeping a journal by each House, recording therein the yea and nay vote on the final passage of every bill, the signing of the same by the presiding officers of each House, and their clerks or secretaries and the presentation of the bill so passed to the Governor, constitute no part of the sovereign power of legislation, but are the mere mechanics of legislative action, which the Constitution imposes upon the members of the Legislature to operate to the end that a proper record of legislative activities may be preserved and the constitutional mandates be obeyed.

The majority opinion seems to admit, however, that in order to operate such mechanical devices or discharge such purely ministerial duties there must be no dispersing of the members of the Legislature after the constitutional expiration of the period of time during which the "Regular sessions of the Legislature may extend," but they must continue together at the place where they were when the period of time during which they could be in constitutional session

expired, because if they dispersed and went out to their meals or to their respective boarding houses or hotels or to their homes they could not again assemble in constitutional session unless recalled into extra session by the Governor.

Now the Constitution does not require the sessions of the Legislature to be terminated by a motion duly adopted to adjourn *sine die*. A majority of the members of each House constitutes a quorum of the House to do business, but a smaller number may adjourn from day to day. Art. III, Sec. 11, Const. And neither House may, without the consent of the other, adjourn for more than three days. Art. III, Sec. 13, Const. At the expiration of the constitutional period of sixty days, to which the regular sessions of the Legislature may extend, the session stands adjourned under the Constitution. No motion is necessary to confirm the passage of time, or give sanction to the constitutional limitation.

The majority opinion admits the "death of the Legislature by constitutional limitation at midnight" of the sixty day period. That is an incorrect expression. The "Legislature," a branch of the government, does not die. It continues in existence. The members continue to hold office to be recalled in extra session, if the Governor deems proper so to do, but the regular session does die. If it is dead, then it has no life to perform mechanical or ministerial duties.

If the session could after death, that is, after its legal and constitutional end, correct journals, cause its presiding officers to sign bills which were passed during the session, and present the same to the Governor, how could he return the bill to the House in which it originated should he immediately exercise his power of veto? Or if the members of the Legislature continued in assemblage within the room

in which they were when the regular session died constitutionally, and remained there without food or rest for two or three days winding up the mechanics or discharging so-called minsterial duties, and presented a bill to the Governor two or three days after the constitutional death of the session and then immediately dispersed for much needed rest, recreation, food and drink, how will the curtailment of the Governor's ten days time after adjournment which he has in which to veto a bill so presented be explained? Will the Constitution be construed to be amended in such cases by the extension of the ten days from the constitutional adjournment by so many days as the session corpse has utilized to operate the mechanics of its creations when alive?

The duties imposed by Sections 12, 17 and 28 of Art. III of the Constitution are not merely mechanical or ministerial duties. They constitute part of the limitations upon the power of legislation imposed by the people to insure an orderly, careful and circumspect exercise of the power. Such was the *ratio decidendi* of the opinion and decision in the case of Amos v. Gunn, 84 Fla. 285, 94 South. Rep. 615.

The power of legislation is the supreme power of a State. Blackstone so recognizes it in the definition of municipal law which he gives. A rule of conduct prescribed by the supreme power of a State prescribing what is right and prohibiting what is wrong. See Sherwood's Blackstone's Com.

It is the power to prescribe rules of conduct for the people, regulating their reciprocal obligations and rights, the acquisition and defense of property and the protection of the inalienable rights of man. It is the power to direct the material and, by indirection or resultant effect, the spiritual destiny of the people. It is the power to build or destroy, to encourage or discourage; the power to promote the happiness of the people or to destroy it. Laws are the

expressed will of the sovereign power and operate upon the lives of the people to promote their welfare or destroy their peace and happiness.

Beneficent and wise laws are the *ultima Thule* of the Supreme power in the cause of humanitarian objects and purposes, while ill considered, wicked or cruel laws are the *de profundis* of political degradation. We are accustomed to say that the powers of government are divided into three arms or branches: the legislative, the executive and judicial, which means that one power is to make laws, another is to interpret or explain them, and another is to enforce them. If there were no laws to govern a society there would be no field in which either the judicial or executive could function. There would be no laws to interpret, none to enforce. The will of the most sefish and powerful would reign, every man his own lawgiver, his own interpreter, and therefore his own executioner. There would be chaos worse confounded. The rule of the jungle beast would be established. Natural law would be man's only measure of activity in any enterprise.

Governments which derive their just powers only from the consent of the governed are established to protect the people in the possession of their unalienable rights to life, liberty and the pursuit of happiness, and the power to make laws in the execution of that design is the greatest and most sacred power of the sovereign authority.

In the establishment of governments like ours constitutions are written as the measure of power which the sovereign commits to its agencies. Is it unreasonable, therefore, to say that in committing the greatest of all powers of the sovereign—that of the power of making laws—to the legislative agency, the people in their written Constitution would circumscribe, define, limit the exercise of such

power by prescribing an orderly, carefully considered and meticulous procedure according to which the power to make laws is exercised? That is exactly what the Constitution does by Sections 12, 17 and 28 of Art. III. According to such course only may legislation be brought into existence. To attempt it in any other way is anarchy.

The people in vesting the power to make laws in the legislative branch, Section 1, Art. III, prescribed with meticulous care how the power would be exercised. The regular sessions shall be held biennially, Sec. 2. A majority of each House shall constitute a quorum to do business, Sec. 11. Each House shall keep a journal of its proceedings, Sec. 12. The enacting clause of every law shall be in a certain form, Sec. 15. Each law shall embrace but one subject and matter properly connected therewith, Sec. 16. Every bill shall be read by its title on its first reading, or by sections if one-third of the members of the House require it, Sec. 17. Every bill shall be read on three several days unless two-thirds of the members present dispense with the rule, Sec. 17; every bill on its second reading shall be read by sections unless two-thirds of the members present in the House where the bill is pending dispense with the rule, Sec. 17; the vote on the final passage of every bill shall be taken by yeas and nays, Sec. 17; such vote shall be entered on the journal of each House, Sec. 17; all bills passed shall be signed by the presiding officer of the respective Houses, and by the Secretary of the Senate and the Clerk of the House of Representatives, Sec. 17. Every bill that may have passed the Legislature shall before becoming a law be presented to the Governor, Sec. 28; if the Governor does not approve it he shall return it to the House in which it originated, which House shall cause such objections to be entered upon its journal and proceed to reconsider it, Sec.

28; if' the Legislature by final adjournment prevent such action by the Governor, the bill shall be a law unless the Governor within ten days after the adjournment shall file such bill with his objections thereto in the office of the Secretary of State, Sec. 28. Regular sessions of the Legislature may extend to sixty days commencing on the first Tuesday after the first Monday in April in every second year after the year 1887, Sec. 2; all of Art. III, Constitution.

These rules and regulations constitute the orderly procedure according to which the sovereign will may be expressed in the enactment of legislation. In sustaining legislation which has been attacked because, as it was alleged, the Legislature in regular session or in extra session had ignored any one or more of these constitutional requirements, this Court has invariably said that where the journal of the Legislature is silent upon the proposition except in the two instances of a defective title or the record of the yea and nay vote, it will presume that the Legislature observed the constitutional requirements and limitations in the exercise of the legislative power; that the members of the Legislature are under oath to support, protect and defend the Constitution and government of the State and are presumed to have observed and obeyed their oath of office; that it would require journalistic evidence or evidence as high in dignity as the legislative journals to overcome the presumption.

The courts are therefore concluded by the legislative judgment that it has complied with the requirements imposed by the Constitution. Stockton v. Powell, 29 Fla. 1, 10 South. Rep. 688; Ames v. Gunn, *supra*.

The converse of that proposition is true and has been declared by this Court since 1849. Courts of justice cannot

act upon the presumption that powers conferred by the Constitution will be abused. Curry v. Marvin, 2 Fla. 411.

The courts would not presume that the Legislature had disobeyed any one of the constitutional mandates required to be observed in the exercise of the legislative power. If it were the rule or lawful to do so, then in the absence of a record showing to the contrary the failure to observe any one of the requirements would invalidate the attempted legislation.

The recited constitutional requirements are, in my view, all of equal dignity and importance. They must all be observed by the Legislature in the exercise of its power to enact laws with equal fidelity to the organic law and devotion to its expressed limitations.

The majority opinion, however, distinguishes between the recited constitutional elements in the process of making law, emphasizing the importance of some and reducing others to a mere mechanical or ministerial function which may be performed by persons designated by the members of the Legislature when in session or by the members of the Legislature after the expiration of the session, whether a majority of the membership of both Houses remain in the Capitol or not.

If a question of the presence of a quorum should arise in such case it could not be determined by those present, because there would be no power to determine it as that power exists only in the members in regular session.

The majority opinion refers to "legislative prerogatives." That is a phrase which has recently been used in discussions pertaining to the activities and powers of the Congress of the United States. I do not agree that the State Legislature has in the true sense of the word any "prerogatives." That word, as Judge Merrill E. Otis, of the United States

District Court of Missouri, said, is in history associated with the exercise of a power for which there is no responsibility or accountability. Certainly the Legislature has no "prerogative" to enact laws in disregard of the limitations imposed upon it by the Constitution in the exercise of that great power. The Legislature is empowered only to enact statutes in discharge of that enormous responsibility in strict observance of the limitations, rules and manner of procedure specifically outlined and charted by the people in the Constitution.

If the members of the Legislature do not observe the constitutional instructions in the matter of its procedure in enacting laws why do they swear to support, protect and defend the government and Constitution of the State? If the Legislature is at liberty to ignore the least of these limitations, if indeed there are any degrees of importance in them, and the Court is foreclosed from reviewing the Act when it is properly presented, then this matter of legislation is worse than solemn mockery.

There cannot be a *de facto* session of the Legislature, which the so-called "hold-over session" is said by some persons to be, because it was either in regular session or it was not on June 1, 1935. The regular session had expired by constitutional limitations at midnight on May 31, 1935. The members of the Legislature who were present in the State Capitol on June 1, 1935, were not assembled in a *"de facto"* session. There cannot exist such an anomalous thing in a constitutional government. The assemblage is either in constitutional session or it is not. If it is not, then it is without power to do any act relating to the enactment of laws. State, *ex rel.* Landis, v. Thompson, 121 Fla. 561, 164 South. Rep. 192; State v. Tippett, 101 Fla. 1117, 134 South. Rep. 52.

To hold that there could be a *de facto* legislative session at which laws may be enacted or any act performed in relation to the enactment of laws as the Constitution requires to be done is to countenance revolution. See Norton v. Shelby County, 118 U. S. 425, 30 L. Ed. 178, 6 Sup. Ct. Rep. 1121.

I am therefore of the opinion that the return to the alternative writ is insufficient and the peremptory writ should issue notwithstanding such return.

BROWN, J., concurs.

BROWN, J. (concurring with Mr. Justice ELLIS). All the members of the Court agree that all bills must be passed by the Legislature during the constitutional session in order to have any validity. No bill adopted after the constitutional session has expired can have any validity. The stream cannot rise higher than its source. The Legislature cannot continue in lawful session beyond the period allotted to it by the Constitution which created it. That is perfectly plain.

But the question here presented is whether a bill passed *before* the constitutional session has expired, can, *after* such expiration, be lawfully signed by the prescribed officers of the two Houses and presented to the Governor.

As pointed out in both the foregoing opinions, Section 17 of Article III provides that: "All bills or joint resolutions so passed shall be signed by the presiding officer of the respective Houses and by the Secretary of the Senate and the Clerk of the House of Representatives."

Section 28 of the same article of the Constitution reads as follows:

"Section 28. Every bill that may have passed the Legislature shall, before becoming a law, be presented to the Governor; if he approves it he shall sign it, but if not he

shall return it with his objections to the House in which it originated, which House shall cause such objections to be entered upon its journal, and proceed to reconsider it; if, after such reconsideration, it shall pass both Houses by a two-thirds vote of members present, which vote shall be entered on the journal of each House, it shall become a law. If any bill shall not be returned within five days after it shall have been presented to the Governor (Sunday excepted) the same shall be a law, in like manner as if he had signed it. If the Legislature, by its final adjournment prevent such action, such bill shall be a law, unless the Governor, within ten days after the adjournment, shall file such bill, with his objections thereto, in the office of the Secretary of State, who shall lay the same before the Legislature at its next session, and if the same shall receive two-thirds of the votes present it shall become a law."

I agree with Mr. Justice ELLIS that the intent of this section is that all bills "that have passed the Legislature" must be presented to the Governor while the Legislature is still in session, which means in lawful and constitutional session. And, of course, all such bills necessarily must be signed by the officers of the respective Houses, as required by Section 17, before they can be presented to the Governor. It follows, therefore, that all bills that have passed the Legislature must be signed by the officers of the respective Houses and presented to the Governor while the Legislature is still in constitutional session.

If there can be such a thing as a *"de facto"* or "hold-over" session of the Legislature for any purpose, after the sixty-day period prescribed by the Constitution has expired, which I do not concede, certainly none such was contemplated by the Constitution, nor could that kind of session carry out the mandates of Sections 17 and 28 of Article III herein-

84

above referred to. In my opinion, the Constitution nowhere contemplates any session of the Legislature other than a constitutionally authorized session.